# UNITED STATES

*vs.*

# THE SCHOONER SALLY MEARS.

1. By reason of its ordinance of secession and its joining the fortunes of the Confederate States, every inhabitant of the State of Virginia became, *ipso facto*, under the laws of war a public enemy of the United States, and his property enemy property, although he may have openly denounced the ordinance of secession and acknowledged his paramount allegiance to the United States.

2. Two days before the passage of the ordinance of secession by the State of Virginia, a vessel cleared from Norfolk of that State for the Barbadoes. She was owned in Virginia, and her officers and crew were inhabitants of that State. On her return voyage she was destined for Baltimore, but was captured by a United States man-of-war twelves miles outside the capes of the Chesapeake. Her papers were regular, and she sailed under the United States flag. Her master, who was owner of one-eighth of the vessel, testified that he considered himself a "subject" of the United States; that he considered his allegiance to the Union as greater and stronger than the allegiance he owed to his native State, and that he would sustain the United States against his native State. *Held*, That the vessel at the time of her capture was enemy property in consequence of the residence of her owners in the enemy country.

In Admiralty No. 17.   Special Term.   Decided January 5, 1864.

LIBEL by the United States and the officers and crew of the United States steamer *Quaker City* against the schooner *Sally Mears*, captured on the high seas and claimed as prize.

THE FACTS are stated in the opinion.

MR. E. C. CARRINGTON, District Attorney, for libellants.

MR. JAMES M. CARLISLE, for libellee.

MR. JUSTICE WYLIE delivered the opinion of the Court:

This vessel and her cargo were captured on the 1st day of July, 1861, about twelve miles outside the capes of the Chesapeake, in the Atlantic Ocean, by the United States

steamer *Quaker City* and sent to this District and libelled as prize of war.

The *Sally Mears* was owned in Matthews County, Virginia, and all the officers and crew of the vessel were inhabitants of that county. George Richardson, the master, was the owner of an interest of one-eighth, and the remaining interests were all owned by citizens of the same county. The crew was shipped on the 12th of April, 1861, and the schooner sailed from Norfolk on or about the 15th of the same month with a cargo of staves for Barbadoes. At the time of her capture she was on her return voyage destined for Baltimore, and in ballast. Her papers were all regular, and she sailed under the United States flag.

The master states in his examination that he considered himself a subject of the United States; that he had always been a subject of the United States; that he considered his allegiance to the Union as greater and stronger than the allegiance he owed to his native State, and that he would sustain the United States against his native State.

At the time of the capture the mouth of the Chesapeake was blockaded by the armed ships of the United States, but the master of the *Sally Mears* had not previously heard of its existence, or of the President's proclamation on that subject.

The Convention at Richmond had passed the Ordinance of Secession on the 17th of April, only two days after the schooner had sailed from Norfolk; and this ordinance had been ratified by a vote of the people of that State on the 24th day of May following. And these acts were preceded and followed by deeds of open and flagrant war against the Government of the United States, in which Virginia made herself a party.

There is no evidence to show that this vessel made any attempt to violate the blockade; nor that the owners, the master or the crew, individually, had taken any part in the hostilities which had so recently commenced, or had any

sympathies with the cause of rebellion. On the contrary, the master of the schooner, in manly words, has proclaimed his adherence to the cause of the Union.

The Court would be happy to relieve the claimant in this case if it could be done consistently with great and settled principles of public law, before whose supremacy all questions of discrimination in favor of individuals must be made to yield.

The laws of war may appear harsh and oppressive in particular cases, when applied to those whose consciences are void of guilt for its inception, or for participation in its conduct; but it should be remembered that peace, permanent and speedy, can be reached only by means of their stern and unflinching enforcement.

Were war to be carried on in any other way it would soon languish into effeminacy, the virtue and manliness of the people would fail, intestine quarrels and contentions would be encouraged, government would be undermined, and hostilities though languishing for want of vigor, would become interminable.

If then it were given us to choose, the court could not hesitate to apply the rules of the *jus belli*, even in a case where it saw the application would produce hardship to individuals, rather than extend its sympathy and relief at the expense of a manifestly wise though vigorous policy.

From the date of the accession of Virginia to the cause of the rebellion in April, 1861, she was engaged in civil war against the Government of the United States. The President by proclamation declared the fact, and called upon the military and naval forces of the country to meet the emergency. From that date the laws of the Union ceased to be acknowledged, its courts were closed, and its officers of justice had resigned their places or were powerless to perform their duties.

Armies of great magnitude were raised on both sides, and on the side of the South, including the State of Virginia, a

new government, calling itself the Confederate States of America, was organized and put into operation throughout the extent of an immense territory.

This was unquestionably civil war, and no longer a mere insurrection. If so, its results must be those which follow in other wars.

One of these results is that the inhabitants of each section have become enemies of those of the other without regard to their individual opinions, principles or feelings. The citizen of Virginia whose vessel is found upon the high seas, is an enemy so far as the fate of his vessel is concerned, although he may openly deny the validity of the ordinance of secession, and denounce the wickedness which has carried his State into the war against the government, to which he acknowledges a paramount allegiance.

He is an enemy by reason of his residence in the enemy country, and will remain such so long as his residence continues unchanged.

This doctrine is clearly stated and its policy ably vindicated in the case of The Venus, 8 Cranch, 253, and in the opinion of Sir William Scott, in The Indian Chief, 3 Robinson's Rep. It has also received the sanction of my predecessor, Chief Judge Dunlop, of the late Circuit Court of this District, in an elaborate opinion delivered in the case of the United States *vs.* The Tropic Wind;* and also of Judge Cadwalader of the District Court of the Eastern District of Pennsylvania, in the case of General Parkhill.

The Sally Mears was therefore at the time of her capture enemy property, made so in consequence of the residence of her owners in the enemy country, and must be condemned to the captors as lawful prize of war.

---

*See this case in the appendix.