# UNITED STATES ET AL. *v.* AMERICAN TRUCKING ASSOCIATIONS, INC. ET AL.

No. 713.   Argued April 26, 1940.—Decided May 27, 1940.

*Mr. Thomas E. Harris,* with whom *Solicitor General Biddle, Assistant Attorney General Arnold,* and *Messrs. Daniel W. Knowlton, Nelson Thomas, George A. McNulty, David A. Pine, Elmer B. Collins,* and *Frank Coleman* were on the brief, for appellants.

*Mr. J. Ninian Beall*, with whom *Mr. Albert F. Beasley* was on the brief, for appellees.

Mr. Justice Reed delivered the opinion of the Court.

This appeal requires determination of the power of the Interstate Commerce Commission under the Motor Carrier Act, 1935, to establish reasonable requirements with respect to the qualifications and maximum hours of service of employees of motor carriers, other than employees whose duties affect safety of operation.

After detailed consideration, the Motor Carrier Act, 1935, was passed.[1] It followed generally the suggestion of form made by the Federal Coordinator of Transportation.[2] The difficulty and wide scope of the problems raised by the growth of the motor carrier industry were obvious. Congress sought to set out its purpose and the range of its action in a declaration of policy which covered the preservation and fostering of motor transportation in the public interest, tariffs, the coördination of motor carriage with other forms of transportation and coöperation with the several states in their efforts to systematize the industry.[3]

While efficient and economical movement in interstate commerce is obviously a major objective of the Act,[4] there are numerous provisions which make it clear that Congress intended to exercise its powers in the non-transpor-

---

[1] 49 Stat. 543.

[2] S. Doc. No. 152, 73rd Cong., 2d Sess., Regulation of Transportation Agencies, p. 350. See p. 25, for discussion of the preliminary steps of motor carrier regulation. Hearings on Regulation of Interstate Motor Carriers, H. R. 5262 and H. R. 6016, before the House Committee on Interstate and Foreign Commerce, 74th Cong., 1st Sess.; Hearings on S. 1629, Senate Committee on Interstate Commerce, 74th Cong., 1st Sess.

[3] § 202; *Maurer* v. *Hamilton,* 309 U. S. 598.

[4] §§ 202, 216, 217, 218.

tation phases of motor carrier activity.[5]  Safety of operation was constantly before the committees and Congress in their study of the situation.[6]

The pertinent portions of the section of the Act immediately under discussion read as follows:

"SEC. 204 (a).  It shall be the duty of the Commission—

"(1) To regulate common carriers by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

"(2) To regulate contract carriers by motor vehicle as provided in this part, and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

"(3) To establish for private carriers of property by motor vehicle, if need therefor is found, reasonable requirements to promote safety of operation, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment . . ."

Shortly after the approval of the Act, the Commission on its own motion undertook to and did fix maximum hours

[5] Services, § 203 (a) (19); brokers, § 203 (a) (18), § 204 (a) (4); security issues, § 214; insurance, § 215; accounts, records and reports, § 220.

[6] *Maurer* v. *Hamilton, supra;* Regulation of Transportation Agencies, *supra,* Highway and Safety Regulations, p. 32; Hearings on S. 1629, *supra,* pp. 122–123, 184.

of service for "employees whose functions in the operation of motor vehicles make such regulations desirable because of safety considerations."[7] A few months after this determination, the Fair Labor Standards Act was enacted.[8] Section 7 of this act limits the work-week at the normal rate of pay of all employees subject to its terms and § 18 makes the maximum hours of the Fair Labor Standards Act subject to further reduction by applicable federal or state law or municipal ordinances. There were certain employees excepted, however, from these regulations by § 13 (b). It reads as follows:

"Sec. 13 (b). The provisions of section 7 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935; . . ."

This exemption brought sharply into focus the coverage of employees by Motor Carrier Act, § 204 (a). Clerical, storage and other non-transportation workers are under this or the Fair Labor Standards Act, dependent upon the sweep of the word employee in this act. The Commission again examined the question of its jurisdiction and in Ex parte No. MC–28 [9] again reached the conclusion that its power under "section 204 (a) (1) and (2) is limited to prescribing qualifications and maximum hours of service for those employees . . . whose activities affect the safety of operation." It added: "The provisions of section 202 evince a clear intent of Congress to limit our jurisdiction to regulating the motor-carrier industry as a part of the transportation system of the nation. To extend that regulation to features which are not char-

---

[7] Ex parte No. MC–2, 3 M. C. C. 665, 667.

[8] 52 Stat. 1060.

[9] 13 M. C. C. 481, 488.

acteristic of transportation or inherent in that industry strikes us as an enlargement of our jurisdiction unwarranted by any express or implied provision in the act, which vests in us all the powers we have."[10] The Wage and Hour Division of the Department of Labor arrived at the same result in an interpretation.[11]

Shortly thereafter appellees, an association of truckmen and various common carriers by motor, filed a petition with the Commission in the present case seeking an exercise of the Commission's jurisdiction under § 204 (a) to fix reasonable requirements "with respect to qualifications and maximum hours of service of all employees of common and contract carriers, except employees whose duties are related to safety of operations; (3) to disregard its report and order in Ex parte MC–28."[12] The Commission reaffirmed its position and denied the petition. The appellees petitioned a three-judge district court to compel the Commission to take jurisdiction and consider the establishment of qualifications and hours of service of all employees of common and contract carriers by motor vehicle.[13] The Administrator of the Wage and Hour Division was permitted to intervene.[14] The district court reversed the Commission, set aside its order and directed it to take jurisdiction of the appellees' petition. 31 F. Supp. 35. A direct appeal to this Court was granted.[15]

In the broad domain of social legislation few problems are enmeshed with the difficulties that surround a de-

[10] 13 M. C. C. 481, 489.

[11] Interpretative Bulletin No. 9, Wage & Hour Manual (1940) 168.

[12] § 204 (a) (1), (6) and (7) (e); Rules of Practice I. C. C., April 1, 1936, Rule XV.

[13] § 205 (h), Motor Carrier Act; Urgent Deficiencies Act, 38 Stat. 220, 28 U. S. C. §§ 47, 47a.

[14] Cf. *Securities & Exchange Comm'n* v. *U. S. Realty & Improvement Co., ante,* p. 434.

[15] Judicial Code § 238; 38 Stat. 208, 219–20; 49 Stat. 543, § 205 (h).

termination of what qualifications an employee shall have and how long his hours of work may be. Upon the proper adjustment of these factors within an industry and in relation to competitive activities may well depend the economic success of the enterprises affected as well as the employment and efficiency of the workers. The Motor Carrier Act lays little emphasis upon the clause we are called upon now to construe, "qualifications and maximum hours of service of employees." None of the words are defined by the section, 203, devoted to the explanation of the meaning of the words used in the Act. They are a part of an elaborate enactment drawn and passed in an attempt to adjust a new and growing transportation service to the needs of the public. To find their content, they must be viewed in their setting.

In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress.[16] There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, particularly in

---

[16] Story, J., in *Minor* v. *Mechanics' Bank,* 1 Peters 46, 64: "But no general rule can be laid down upon this subject, further than that that exposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object of the legislature in the enactment." *Pennington* v. *Coxe,* 2 Cranch 33, 59; *James* v. *Milwaukee,* 16 Wall. 159, 161; *Atkins* v. *Disintegrating Co.,* 18 Wall. 272, 301; *White* v. *United States,* 191 U. S. 545, 551; *Ozawa* v. *United States,* 260 U. S. 178, 194; *United States* v. *Stone & Downer Co.,* 274 U. S. 225, 239; *Gulf States Steel Co.* v. *United States,* 287 U. S. 32, 45; *Royal Indemnity Co.* v. *American Bond & M. Co.,* 289 U. S. 165, 169; *Lincoln* v. *Ricketts,* 297 U. S. 373, 376; *Foster* v. *United States,* 303 U. S. 118, 120.

a law drawn to meet many needs of a major occupation.[17]

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning.[18] When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act.[19] Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" [20] this Court has followed that purpose, rather than the literal words.[21] When aid to construction of

---

[17] Cf. Davies, The Interpretation of Statutes in the Light of their Policy by the English Courts, 35 Columbia Law Review 519; Radin, Statutory Interpretation, 43 Harvard Law Review 863; Landis, A Note on "Statutory Interpretation," 43 Harvard Law Review 886; R. Powell, Construction of Written Instruments, 14 Indiana Law Journal 199, 309, 324; Jones, The Plain Meaning Rule, 25 Washington University Law Quarterly 2.

[18] Taft v. Commissioner, 304 U. S. 351, 359; Helvering v. City Bank Co., 296 U. S. 85, 89; Wilbur v. United States, 284 U. S. 231, 237; Crooks v. Harrelson, 282 U. S. 55, 60; United States v. Missouri Pacific R. Co., 278 U. S. 269, 278; Van Camp & Sons v. American Can Co., 278 U. S. 245, 253; Caminetti v. United States, 242 U. S. 470, 490; Pennsylvania R. Co. v. International Coal Co., 230 U. S. 184, 199.

[19] Armstrong Co. v. Nu-Enamel Corp., 305 U. S. 315, 332; Sorrells v. United States, 287 U. S. 435, 446; United States v. Ryan, 284 U. S. 167, 176.

[20] Ozawa v. United States, 260 U. S. 178, 194.

[21] Helvering v. Morgan's, Inc., 293 U. S. 121, 126; Johnson v. Southern Pacific Co., 196 U. S. 1, 14; Popovici v. Agler, 280 U. S. 379; Smiley v. Holm, 285 U. S. 355; Williams v. United States, 289 U. S. 553; Maurer v. Hamilton, supra, pp. 612, 615.

the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use,[22] however clear the words may appear on "superficial examination." [23] The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion.[24] Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, "excepting as a different purpose is plainly shown." [25]

The language here under consideration, if construed as appellees contend, gives to the Commission a power of regulation as to qualifications and hours of employees quite distinct from the settled practice of Congress. That policy has been consistent in legislating for such regulation of transportation employees in matters of movement

---

[22] *Boston Sand & Gravel Co.* v. *United States,* 278 U. S. 41, 48.

[23] *Helvering* v. *New York Trust Co.,* 292 U. S. 455, 465.

[24] Cf. Committee on Ministers' Powers Report (Cmd. 4060, 1932), p. 135.

[25] *United States* v. *Jefferson Electric Co.,* 291 U. S. 386, 396; *United States* v. *Arizona,* 295 U. S. 174, 188, 191; *Keifer & Keifer* v. *R. F. C.,* 306 U. S. 381, 394; *Ozawa* v. *United States, supra.*

and safety only. The Hours of Service Act [26] imposes restrictions on the hours of labor of employees "actually engaged in or connected with the movement of any train." The Seamen's Act [27] limits employee regulations under it to members of ships' crews. The Civil Aeronautics Authority has authority over hours of service of employees "in the interest of safety." [28] It is stated by appellants in their brief with detailed citations, and the statement is uncontradicted, that at the time of the passage of the Motor Vehicle Act "forty states had regulatory measures relating to the hours of service of employees" and every one "applied exclusively to drivers or helpers on the vehicles." In the face of this course of legislation, coupled with the supporting interpretation of the two administrative agencies concerned with its interpretation, the Interstate Commerce Commission and the Wage and Hour Division, it cannot be said that the word "employee" as used in § 204 (a) is so clear as to the workmen it embraces that we would accept its broadest meaning. The word, of course, is not a word of art. It takes color from its surroundings and frequently is carefully defined by the statute where it appears. [29]

[26] 34 Stat. 1415.

[27] 38 Stat. 1164, 1169, 1170–84.

[28] 52 Stat. 1007, § 601 (a) (5). This authority has apparently been exercised only as to pilots and copilots. Dept. of Commerce, Bureau of Air Commerce, Civil Air Regulations, No. 61, Scheduled Airline Rules (Interstate), as amended to May 31, 1938, §§ 61.518–61.5185.

[29] That the word "employees" is not treated by Congress as a word of art having a definite meaning is apparent from an examination of recent legislation. Thus the Social Security Act specifically provides that "The term 'employee' includes an officer of a corporation," (42 U. S. C. § 1301 (a) (6)) while the Fair Labor Standards Act specifically exempts "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity. . . ."

546

We are especially hesitant to conclude that Congress intended to grant the Commission other than the customary power to secure safety in view of the absence in the

(29 U. S. C. § 213 (a) (1)). In the Railroad Unemployment Insurance Act, Congress expressly recognized the variable meaning of employee even when defined at length and used only in a single act: ". . . 'employee' (except when used in phrases establishing a different meaning) means . . ." (45 U. S. C. § 351 (d)). In a statute permitting heads of departments to settle claims up to $1,000 arising from the negligence of "employees of the Government," Congress gives recognition to the fact that the term is not on its face all-inclusive by providing: " 'Employee' shall include enlisted men in the Army, Navy and Marine Corps." (31 U. S. C. §§ 215, 216.) See also the varying definitions of "employees" in the following statutes: Railroad Retirement Act, 45 U. S. C. § 228a (b) (c); Interstate Commerce Act, 49 U. S. C. § 1 (7); Emergency Railroad Transportation Act, 49 U. S. C. § 251 (f); Communications Act, 47 U. S. C. § 210; National Labor Relations Act, 29 U. S. C. § 152 (3); Maritime Labor Relations Act, 46 U. S. C. § 1253 (c); Classification Act of 1923 (Civil Service), 5 U. S. C. § 662; U. S. Employees' Compensation Act, 5 U. S. C. § 790; Longshoremen's and Harbor Workers' Compensation Act, 33 U. S. C. § 902; Boiler Inspection Act, 45 U. S. C. § 22; Railway Labor Act, 45 U. S. C. § 151 (5).

Where the term "employee" has been used in statutes without particularized definition it has not been treated by the courts as a word of definite content. See *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 520 (consulting engineers performing services for states, municipalities, and water districts held not to be "employees" under statute exempting "officers and employees under . . . any State, . . . or any local subdivision thereof" from the income tax); *Waskey* v. *Hammer*, 223 U. S. 85 (mineral surveyor, appointed by the surveyor but paid by private persons, is within prohibition of statute prohibiting "employés in the General Land Office" from purchasing public land); *Nashville, C. & St. L. Ry.* v. *Railway Employees' Dept.*, 93 F. 2d 340 (furloughed railroad workers entitled to priority in rehiring held "employees" within meaning of Railway Labor Act), discussed in 51 Harv. L. Rev. 1299; *Latta* v. *Lonsdale*, 107 F. 585 (attorney not "employee" within meaning of statute giving "employees" preference against assets of insolvent corporations); *Vane* v. *Newcombe*, 132 U. S. 220 (contractor who built lines for telegraph company not "em-

legislative history of the Act of any discussion of the desirability of giving the Commission broad and unusual powers over all employees. The clause in question was not contained in the bill as introduced.[30]  Nor was it in the Coordinator's draft.[31]  It was presented on the Senate floor as a committee amendment following a suggestion of the Chairman of the Legislative Committee of the Commission, Mr. McManamy.[32]  The committee reports

ployee" within statute giving employees liens against corporate property); *Malcomson* v. *Wappoo Mills*, 86 F. 192 (same); cf. *United States* v. *Griffith*, 55 App. D. C. 123; 2 F. 2d 925 (War Department clerk receiving disability compensation held employee of government within common law rule of the District of Columbia that employee of a litigant cannot be a member of jury); see also, *Hull* v. *Philadelphia & Reading Ry. Co.*, 252 U. S. 475; *Louisville, E. & St. L. R. Co.* v. *Wilson*, 138 U. S. 501; *Campbell* v. *Commissioner*, 87 F. 2d 128; *Burnet* v. *Jones*, 50 F. 2d 14; *Burnet* v. *McDonough*, 46 F. 2d 944.

[30] S. 1629, 74th Cong., 1st Sess.

[31] S. Doc. 152, 73rd Cong., 2nd Sess., p. 352, § 304 (a) (1).

[32] See the testimony of Mr. McManamy in Hearings on S. 1629 before the Senate Committee on Interstate Commerce, 74th Cong., 1st Sess., pp. 122, 123:

"The regulation of the hours of service of bus and truck operators is far more important from a safety standpoint than the regulation of the hours of service of railroad employees because the danger is greater. . . . This could be accomplished by inserting in section 304 (a) (1) and (2), lines 9 and 15, page 8, following the word 'records' in both lines, the words which appear in S. 394, as follows: 'qualifications and maximum hours of service of employees.' "

The clause in question came from § 2 (a) (1) of S. 394, 74th Cong., 1st Sess., a subsection otherwise substantially like the corresponding subsection in S. 1629.

Senator Wheeler, Chairman of the Committee on Interstate Commerce and sponsor of the bill, explained the provision on the floor of the Senate: ". . . the committee amended paragraphs (1) and (2) [of § 204] to confer power on the Commission to establish reasonable requirements with respect to the qualifications and maximum hours of service of employees of common and contract carriers, . . .

and the debates contain no indication that a regulation of the qualifications and hours of service of all employees was contemplated; in fact the evidence points the other way. The Senate Committee's report explained the provisions of § 204 (a) (1), (2) as giving the commission authority over common and contract carriers similar to that given over private carriers by § 204 (a) (3).[33] The Chairman of the Senate Committee expressed the same thought while explaining the provisions on the floor of the Senate.[34] When suggesting the addition of the clause, the Chairman of the Commission's Legislative Committee said: ". . . it relates to safety." [35] In the House the member in charge of the bill characterized the provisions as tending "greatly to promote careful operation for safety on the highways," and spoke with assurance of the Commission's ability to "formulate a set of reasonable rules . . . including therein maximum labor-

---

This suggestion came to us, I think, from the chairman of the legislative committee of the Interstate Commerce Commission. . . .

"In order to make the highways more safe, and so that common and contract carriers may not be unduly prejudiced in their competition with peddler trucks and other private operators of motor trucks, a provision was added in subparagraph 3 giving the Commission authority to establish similar requirements with respect to the qualifications and hours of service of the employees of such operators. . . ." 79 Cong. Rec. 5652.

[33] S. Rep. 482, 74th Cong., 1st Sess. The report stated: "No regulation is proposed for private carriers except that an amendment adopted in committee authorizes the Commission to regulate the 'qualifications and maximum hours of service of employees and safety of operation and equipment' of private carriers of property by motor vehicle in the event that the Commission determines there is need for such regulation. Other amendments adopted by the committee confer like authority upon the Commission with respect to common and contract carriers." Safety of operation and equipment was in the original bill.

[34] See last paragraph of remarks of Senator Wheeler, note 32 *supra*.

[35] Hearings, note 32 *supra*.

hours service on the highway." [36]   And in the report of the House Committee a member set out separate views criticizing the delegation of discretion to the Commission and proposing an amendment providing for an eight-hour day for "any employee engaged in the operation of such motor vehicle." [37]

The Commission and the Wage and Hour Division, as we have said, have both interpreted § 204 (a) as relating solely to safety of operation.   In any case such interpretations are entitled to great weight.   This is peculiarly true here where the interpretations involve "contemporaneous contruction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." [38]   Furthermore, the Commission's interpretation gains much persuasiveness from the fact that it was the Commission which suggested the provisions' enactment to Congress. [39]

It is important to remember that the Commission has three times concluded that its authority was limited to securing safety of operation.   The first interpretation was made on December 29, 1937, when the Commission stated: " . . . until the Congress shall have given us a more particular and definite command in the premises, we shall limit our regulations concerning maximum hours of service to those employees whose functions in the operation of motor vehicles make such regulations desirable because of safety considerations." [40]   This expression was half a year old when Congress enacted the Fair Labor Standards Act with the exemption of § 13 (b) (1).   Seemingly the

[36] 79 Cong. Rec. 12206.

[37] H. R. Rep. No. 1645, 74th Cong., 1st Sess.

[38] *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294, 315.

[39] *Hassett* v. *Welch*, 303 U. S. 303, 310.

[40] Ex parte No. MC–2, 3 M. C. C. 665, 667.

Senate at least was aware of the Commission's investigation of its powers even before its interpretation was announced.[41] Under the circumstances it is unlikely indeed that Congress would not have explicitly overruled the Commission's interpretation had it intended to exempt others than employees who affected safety from the Labor Standards Act.

It is contended by appellees that the difference in language between subsections (1) and (2) and subsection (3) is indicative of a congressional purpose to restrict the regulation of employees of private carriers to "safety of operation" while inserting broader authority in (1) and (2) for employees of common and contract carriers. Appellants answer that the difference in language is explained by the difference in the powers. As (1) and (2) give powers beyond safety for service, goods, accounts and records, language limiting those subsections to safety would be inapt.

Appellees call our attention to certain pending legislation as sustaining their view of the congressional purpose in enacting the Motor Carrier Act. We do not think it can be said that the action of the Senate and House of Representatives on this pending transportation legislation throws much light on the policy of Congress or the meaning attributed by that body to § 204 (a). Aside from the very pertinent fact that the legislation is still unadopted, the legislative history up to now points only to a hesitation to determine a controversy as to the meaning of the present Motor Carrier Act, pending a judicial determination.[42]

---

[41] 81 Cong. Rec. 7875.

[42] The pending legislation is S. 2009, 76th Cong., 1st Sess., 84 Cong. Rec. 3509. As to the point here under discussion, the report of the Senate Committee said: "Paragraph (1) of section 34 of the bill is based on the provisions of subparagraphs (1), (2), and (3) of section 204 (a) of the Motor Carrier Act. In the original draft, there was inserted at the beginning of the paragraph the clause 'in order to promote safety of operations,' thus making clear that the Commis-

One amendment made to the then pending Motor Carrier Act has relevance to our inquiry. Section 203 (b) reads as set out in the note below.[43] The words, "except

---

sion's power to regulate qualifications and maximum hours of service of employees is confined to those who have anything to do with safety of operation. This is a question with respect to which considerable doubt seems to have arisen under the wording of the present law. Upon the strenuous objection of the truckers claiming conflict between this law and the Fair Labor Standards Act, the bill [i. e., the committee amendment] restores the law to the present provisions of the Motor Carrier Act." S. Rep. No. 433, 76th Cong., 1st Sess., p. 24. The bill passed the Senate. The House bill left § 204 (a) (1), (2) and (3) of the present act unchanged. 84 Cong. Rec. 9459; H. R. Rep. No. 1217, 76th Cong., 1st Sess., 84 Cong. Rec. 10125. While the bills were in conference the Chairman of the Legislative Committee of the Interstate Commerce Commission sent to the chairmen of the House and Senate Committees a letter on the House and Senate bills which suggested that both bills explicitly limit the Commission's jurisdiction over qualifications and hours of service of employees to considerations of safety. The letter stated: "While the subsection [in the Senate bill] follows the existing language of section 204 . . ., a controversy has arisen in regard to the meaning of that language. . . . This controversy has now reached the Supreme Court. We think it may well be determined in this new legislation. In our judgment, if restrictions on hours of labor for social and economic reasons are to be imposed, this should be done by Congress, and no duty in that respect should be delegated to the Commission, which has no experience which particularly fits it for the performance of such a duty. Our authority over qualifications and hours of service of employees should, therefore, be confined to the needs of safety in operation. . . ." On April 26, 1940, the House conferees reported to the House a compromise bill agreed on by the conference committee which left § 204 (a) (1), (2), and (3) of the Motor Carrier Act unamended. 86 Cong. Rec. 7847; H. R. Rep. No. 2016, 76th Cong., 3d Sess. On May 9, 1940, the House because of disagreement with sections of this bill not here relevant voted to recommit the bill to the conference committee. 86 Cong. Rec. 8986.

[43] "(b) Nothing in this part, *except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment* shall be construed to include (1) motor vehicles employed solely in transporting

the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of

school children and teachers to or from school; or (2) taxicabs, or other motor vehicles performing a bona fide taxicab service, having a capacity of not more than six passengers and not operated on a regular route or between fixed termini; or (3) motor vehicles owned or operated by or on behalf of hotels and used exclusively for the transportation of hotel patrons between hotels and local railroad or other common carrier stations; or (4) motor vehicles operated, under authorization, regulation, and control of the Secretary of the Interior, principally for the purpose of transporting persons in and about the national parks and national monuments; or (4a) motor vehicles controlled and operated by any farmer, and used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farm; or (4b) motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended; or (5) trolley busses operated by electric power derived from a fixed overhead wire, furnishing local passenger transportation similar to street-railway service; or (6) motor vehicles used exclusively in carrying livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof); or (7) motor vehicles used exclusively in the distribution of newspapers; nor, unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in section 202, shall the provisions of this. part, *except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment* apply to: (8) The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone, and provided that the motor carrier engaged in such transportation of passengers over regular or irregular route or routes in interstate commerce is also lawfully engaged in the intrastate transportation of passengers over the entire length of such interstate route or routes in accordance with the laws of each

operation or standards of equipment," italicized in the note, were added by amendment in the House after the passage of S. 1629 in the Senate with the addition of the disputed clause to § 204 (a) (1) and (2).[44]   It is evident that the exempted vehicles and operators include common, contract and private carriers.  It seems equally evident that where these vehicles or operators were common or contract carriers, it was not intended by Congress to give the Commission power to regulate the qualifications and hours of service of employees, other than those concerned with the safety of operations.

Our conclusion, in view of the circumstances set out in this opinion, is that the meaning of employees in § 204 (a) (1) and (2) is limited to those employees whose activities affect the safety of operation.  The Commission has no jurisdiction to regulate the qualifications or hours of service of any others.  The decree of the district court is accordingly reversed and it is directed to dismiss the complaint of the appellees.

*Reversed.*

The CHIEF JUSTICE, MR. JUSTICE McREYNOLDS, MR. JUSTICE STONE, and MR. JUSTICE ROBERTS are of opinion that the decree should be affirmed for the reasons stated in the opinion of the district court, 31 F. Supp. 35.

State having jurisdiction; or (9) the casual, occasional, or reciprocal transportation of passengers or property in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business."

[44] H. R. Rep. No. 1645, 74th Cong., 1st Sess.