## ISPASS et al. v. PYRAMID MOTOR FREIGHT CORPORATION.

District Court, S. D. New York.
Nov. 29, 1943.

566

Leon E. Spielvogel, by Benjamin C. Klores, both of New York City, for plaintiffs.

Charles E. Cotterill, of New York City, for defendant.

JAMES ALGER FEE, District Judge.

The plaintiffs in this case are employees of defendant, which is a common carrier for hire of freight by motor between various cities of the east coast in interstate commerce. Plaintiffs assisted in loading and unloading trucks of defendant from and on the sidewalks of the "garment center", and at and near the subterminal maintained by defendant at 38th Street in New York City. This action is brought under the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., since plaintiffs claim they were not paid for overtime according to the rubric thereof.

The difficulty with the case at the outset lies in the fact that the defendant is under the jurisdiction of the Interstate Commerce Commission for most purposes. Unquestionably, that body also prima facie had the power to regulate in the first instance, at least, the maximum hours of the employees of defendant under § 204 (a) (1), 49 U.S.C.A. § 304(a) (1). But in the opinion of the Commission under the title "Jurisdiction Over Employees of Motor Carriers", 13 M.C.C. 481, that body, construing the statute in the light of the facts and guided by legislative policy, held that they had the "power" to regulate only the maximum hours of those employees whose activities directly affect the safety of the operation of motor vehicles in interstate and foreign commerce. The Supreme Court of the United States, in a different proceeding, virtually affirmed the construction placed upon the Act by the Commission. United States v. American Trucking Associations, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345.

Where a governmental policy has been declared legislatively and the enforcement is committed to an administrative body so far as possible, the courts should permit that body to interpret the facts in the light of the policy in the first instance. The courts should not struggle for primary jurisdiction in such a field. Nor should the primary enforcement of the policy be hindered by judicial interference, unnecessarily. No doubt the courts should retain the power of review of governmental action to prevent the expansion of the executive power unwarranted by statute. Particularly should this be true regarding jurisdictional questions and construction of the statute as to inclusion and exclusion of states of fact. But, at the outset, the determination should generally be made by the administrative body.

In the opinion above cited[1] the Commission, after stating the test as above, said that drivers were certainly within the class over which power could be exercised, and proceeded as follows:

"It may well be that the activities of some employees other than drivers likewise affect the safety *of operation of motor vehicles engaged in interstate and foreign commerce*. If common and contract carriers, or private carriers of property, or their employees believe that the activities of employees other than drivers affect the safety of operation of motor vehicles engaged in interstate and foreign commerce, they may file an appropriate petition, asking that a hearing be held and the question determined."

This case involves the negative of that proposition. Here the employees are contending that they, although employed by such a carrier, are not within the jurisdiction of the Commission. But if the question of inclusion is one for the Commission, demonstrably the question of exclusion is for the Commission, also. This process in either phase is not the textual construction of a statute, but the interpretation of a policy in the light of the facts, limited by the statute. The Commission has excluded certain employees but has included "helpers" and "loaders" at the terminals.

The plaintiffs, generally speaking, bring goods in carriers or push carts from the

---

[1] Jurisdiction over Employees of Motor Carriers, 13 M.C.C. 481, 488.

loft buildings of the garment center to the trucks and pass these to the persons who ride with the trucks and stow the goods therein, in the loading operation. On unloading, plaintiffs receive goods from such persons, place them in push carts or carriers and deliver these to loft buildings, where the garment makers are housed. Plaintiffs, with one exception, do not ride on the motor vehicles, but occasionally enter therein to assist either in unloading or loading. One of plaintiffs for some period of time, rode on a truck and assisted in loading and unloading for four or five hours a day as a part of his regular duty.

The Commission included "loaders" within their jurisdiction, saying in part:

"The large carriers, however, and particularly those who have important operations from terminal, employ men variously called loaders, dockmen, or helpers, and hereinafter called loaders, whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse."

"The evidence makes it entirely clear that a motor vehicle must be properly loaded to be safely operated on the highways of the country. If more weight is placed on one side of the vehicle than on the other, there is a tendency to tip when rounding curves. If more weight is placed in the rear of the vehicle, the tendency is to raise the front wheels and make safe operation difficult. Further, it is necessary that the load be distributed properly over the axles of the motor vehicle." [2]

The Commission included armed guards and conductorettes as employees essential to the safety of the operation of motor vehicles transporting property and persons in interstate and foreign commerce. There were three concurring opinions. One of these questioned the inclusion of conductorettes and guards. Two questioned inclusion of mechanics and loaders. The Commission say:

"We believe that it is neither necessary nor practicable to draw fine distinctions between the work done by the various employees who ride on the motor vehicle in other capacities than that of driver. To some extent at least they all engage in activities which directly affect safety of operation. An attempt to limit our jurisdiction over them in accordance with the degree in which they engage in such activities would create confusion and continual controversy. They will be included in the category of helpers." [3]

If such fine distinctions are not to be employed in dealing with those who ride upon the vehicle, why should the court hold such distinctions should be applied in dealing with "loaders" "in a law drawn to meet many needs of a major occupation." [4]

The duties of "loaders" are so closely akin to the duties performed by plaintiffs. as above outlined, that it may well be contended that the Commission intended to exercise power over the class to which plaintiffs belong also. At least plaintiffs can only be excluded by drawing the fine distinctions which are denounced in the opinion above quoted. The question of whether the functions of plaintiffs affect the safety of operation is peculiarly a question of fact requiring technical knowledge for its solution.

The Commission also found "that no employees * * * other than drivers" and mechanics, loaders and helpers "perform duties which directly affect the safety of operation".[5] This might be construed as a direct exclusion by the Commission of office employees of the class of rate clerks. Therefore, the indicated solution is to allow the Commission to deal with the situation primarily subject to appropriate review by the courts.

In Missel v. Overnight Motor Transportation Co., Inc.,[6] plaintiff, who was a rate clerk of a common carrier of freight in interstate commerce by motor vehicle, brought action under the Fair Labor Standards Act for overtime wages. It was held, on motion to dismiss, over the contention that primary jurisdiction to determine the question lay in the Commission, that the motion should be overruled. A rate clerk, obviously, has less direct connection with operation than a "dispatcher". The Commission found regard-

2 In the Matter of Maximum Hours of Service of Motor Carrier Employees, 28 M.C.C. 125, 136.

3 In the Matter of Maximum Hours of Service of Motor Carrier Employees, supra 134.

4 United States v. American Trucking Associations, supra, 310 U.S. 542, 543, 60 S.Ct. 1059, 84 L.Ed. 1345.

5 In the Matter of Maximum Hours of Service of Motor Carrier Employees, supra, 139.

6 D.C., 36 F.Supp. 980.

ing a dispatcher that: "The dispatchers do no mechanical work on the motor vehicles, nor do they load or unload. They are not drivers, and they do not accompany the drivers while the motor vehicles are operated in interstate or foreign commerce." [6a] Actually, the Commission had already determined that power over this class of employees did not exist.

In West v. Smoky Mountains Stages, Inc.,[7] the court independently came to the conclusion that the activities of a mechanic "did affect the safety of operation of the busses * * * being operated in interstate commerce", but as the opinion shows, the Commission had already concluded the controversy with respect to this class of employees.

In Magann v. Long's Baggage Transfer Co., Inc.,[8] the court expressly refuses to follow certain indicated findings of the Commission and the Wage and Hour Division of the Department of Labor, and finally arrives at the conclusion that a "driver" of trucks used exclusively for the transportation of the mails is entitled to recover under the scale of the Fair Labor Standards Act. Whatever this opinion means, it is not binding upon this court and will not be followed.

In Interpretative Bulletin No. 9, the administrative body charged with enforcement of the Fair Labor Standards Act, the Wage and Hour Division, United States Department of Labor, in a note says that "at least three courts have held that in suits under section 16(b), the courts may determine what employees lie within the Commissioner's power to prescribe hours of service and may reach decisions different from those reached by the Commission." [9] But the Division recognizes that the Commission is endowed with the authority by the statute to fix these classes by inclusion and exclusion and that the Division has no such power, although great weight is accorded its interpretations. Still, the Division acts in a broader field and is no expert in a specific field, as is the Commission.

For a single District Judge to attempt to determine the limits of power between administrative agencies in this stricken field of regulation would be to invite the charge of usurpation. Suffice it to say that Congress has given the authority to the Commission. Whether the "power" has been exercised or not is not the question. Any class of employees over which the Commission may exercise the power falls under the express language of the exemption.[10] The Commission has expressly held that it has the "power" of regulation of the maximum hours of "loaders".

If the plaintiffs fall within that classification, then the Commission has already ruled adversely to their contention and it does not lie in the hands of a court constituted such as this one, to correct them. If the Commission has not determined that the class of employees to which plaintiffs belong are "loaders", then they have not excluded plaintiffs from the exercise of jurisdiction, as yet. This court, then, is still without the benefit of a "contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly * * *." [11]

■ If a court now attempts to deal with such a situation, the process must include the construction of the decision of the Commission, in the light of the facts. Congress has indicated that the courts are not primarily equipped to determine what employees affect the safety of such operations by their activities. Therefore, the Commission should say in an appropriate proceeding whether these employees under the peculiar situation fell within or without the classification of "loaders" already established by them, before the court should grant a recovery. Of course, if the Commission decide this question erroneously, there may be review. But such a tribunal is a specially constituted three-judge court, with a possibility of direct appeal to the Supreme Court of the United

---

6a In the Matter of Maximum Hours of Service of Motor Carrier Employees, supra, 135.

7 D.C., 40 F.Supp. 296, 297.

8 D.C., 39 F.Supp. 742, 743.

9 Citing Missel v. Overnight Motor Transportation Co., Inc., supra; West v. Smoky Mountains Stages, supra; Ma-

gann v. Long's Baggage Transfer Co., supra, above referred to.

10 § 13(b) (1) of the Fair Labor Standards Act of 1938.

11 Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796.

569

States. Whether the industry of transportation of goods in interstate and foreign commerce requires that "loaders", such as plaintiffs, be regulated by the Commission, is a complicated question requiring expert technical treatment, as was said in dealing with a rate situation in Standard Oil Company (Indiana) v. United States, 283 U.S. 235, 238, 239, 51 S.Ct. 429, 430, 75 L.Ed. 999:

"The case before the Commission did not, as contended, involve merely the construction of the written words employed in a rate tariff—a simple question of law; but required consideration of matters of fact and the application of expert knowledge for the ascertainment of the technical meaning of the words and a correct appreciation of a variety of incidents affecting their use. It is evident from an inspection of the record, as the Commission in its first report said, that 'both cases concern unusually complicated and technical tariff situations,' the proper determination of which called for the exercise of the trained judgment of that body of experts, 'appointed by law and informed by experience.' Illinois Central R. Co. v. Interstate Commerce Comm., 206 U.S. 441, 454, 27 S.Ct. 700, 51 L.Ed. 1128. And to that body, in the interest of uniformity, the determination must be left."

The determination of whether the Commission has "power" over the "loaders", who fall in the classification with plaintiffs, is one which will set the pattern for the future and will cover many states of fact, as has the determination that "drivers" are under their authority. The analogies of Texas & Pacific Railway Company v. Abilene Cotton Oil Company, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075, are compelling. Here, as there, expert judgment in the light of pragmatic conditions of operation, should not be hampered by judicial pre-judgment on the circumscribed facts involved in a single case. The criticism of the application thereof, though ably stated, is not convincing.[12]

The parallels between the instant situation and that of rate determination are brought out prominently by consideration of an excellent opinion by Judge Caffey

of this court, under title of Fitzhenry v. Erie Railroad Company.[13] There a shipper brought suit to enjoin the railroad from continuing the practice of making progressive charges for truckage and, when freight carried was of a certain weight, making no charge therefor. The contention there was, that such a schedule infringed "the statute itself" and, therefore, the shipper was entitled to injunction without ever having applied to the Commission. It was said in the opinion:

"It may well be that the line drawn by the defendant between the service for which it does and the service for which it does not make a charge is erroneous. It may even be that it can be established that it is arbitrary. The defendant may be unable to sustain the reasonableness or justice of the practice. Whether this be so presents a problem of vast complications. Its solution would involve assembly and consideration of a great mass of facts having an economic bearing and having to do with the way railroad transportation is carried on. A court, however, is not equipped initially to pass on it. Congress has erected and maintains the commission for the very purpose of conducting the investigations and making the findings needed for reaching intelligent conclusions about such matters. Until those investigations have occurred and those findings are before the court, it is not within its province to entertain lawsuits in which such extraneous factors are determinative or even play a part. The philosophy of the foundation on which this proposition rests seems to me never to have been better elucidated than in Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075, when it was originally announced."

The question is what action should be taken here. Although there is authority to the contrary,[14] the court, in view of the fact that the holding is novel, should permit the cause to remain undismissed, if the plaintiffs indicate a serious intention of having their status fixed by the Commission.

The cause will be held open for further action.

---

[12] Judge William C. Coleman, in Missel v. Overnight Motor Transportation Co., Inc., supra.

[13] 7 F.Supp. 880, 883.

[14] Baltimore & Ohio Railroad v. Denney & Co., 246 Ill.App. 22, 24.