**CREAN et al. v. M. MORAN TRANSP. LINES, Inc., et al.**

**Civil Action No. 1335.**

District Court, W. D. New York.

Aug. 15, 1944.

See also, D.C., 50 F.Supp. 107; D.C., 54 F.Supp. 765.

Israel Rumizen, of Buffalo, N. Y., for plaintiffs.

Mortimer Allen Sullivan, of Buffalo, for defendants.

KNIGHT, District Judge.

This action is brought by certain employees of the defendants who seek to recover compensation under Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b), popularly known as the Wage and Hour Law. Associated Transport, Inc., acquired M. Moran Transportation Lines, Inc., in or about December, 1942.

Section 7(a) (3) of the Fair Labor Standards Act, 29 U.S.C.A. § 207(a) (3), provides:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce" for a work week longer than certain designated hours, "unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one half times the regular rate at which he is employed."

This Court is now to determine whether or not plaintiffs' employment comes within the exceptions of Section 13(a) (1, 2), (b) (1, 2) of the Act, 29 U.S.C.A. § 213(a) (1, 2), (b) (1, 2). Section 13(b) (1) provides:

"The provisions of section 7 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act, 1935."

Upon previous motions in this case I have decided that the burden of proof is on the defendant employer to establish whether or not the plaintiffs come within the exception to the Act.

Whether these employees are exempted from the Wage and Hour Law's provisions depends upon the nature of their work or employment. When that is determined, then the question of the applicable statute is determined.

In United States v. American Trucking Associations Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345, the word "employees" within section 204(a) (1, 2) of the Motor Carrier Act, 49 U.S.C.A. § 304 (a) (1, 2), was limited to mean those employees whose activities affect safety of operation. However, a substantial part of the employee's time must be devoted to the exercise of the duties and activities which affect the safety of operation of the employer's motor trucks in interstate commerce. "By substantial is not meant a majority of the time." Ex parte No. MC–2, 28 M.C.C. 125; Kosofsky v. Champion Trucking Co., Inc., 181 Misc. 470, 43 N.Y. S.2d 5.

Plaintiffs were employed at defendant's Buffalo Trucking Terminal as "callers," "wheelers" and "checkers" during the period from October 24, 1938, to December 15, 1942. The men are in fact dock men at defendant's terminal in Buffalo. In brief the work of each is that the "callers" unload incoming semi-trailers and truck bodies of their freight, while the "wheelers" load the outgoing semi-trailers and bodies. The "checkers" work with the way bills or bills of lading and their function was to check the shipments for breakage, correctness in the number of packages or cartons in each individual shipment, direct the movement of freight on the loading dock for further shipment or local delivery as the case might be. They were also charged with noting the condition of the bodies as regards their condition and whether repairs were needed, and to the responsibility of seeing that so-called dangerous shipments (termed dangerous by the I.C.C.) bore the proper label.

"Callers" and "wheelers" are within the exception to the Act and cannot recover. In Ex parte No. MC–2, supra, findings of fact and conclusions of law were made respecting various types of trucking company employees by the Interstate Commerce Commission. Amongst those considered were "loaders", and the term as used therein was defined as "loaders, dockmen, or helpers * * * whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse." The Commission concluded with a finding of fact (finding number 2) that loaders, "devote a large part of their time to activities which directly affect the safety of operation of motor vehicles in interstate or foreign commerce." The interpretations of the Interstate Commerce Commission are entitled to great weight, United States v. American Trucking Associations, supra, and we shall follow them here. Employees who load and unload trucks engaged in interstate commerce are not covered by the

Fair Labor Standards Act so far as hours of labor are concerned. Tinerella v. Des Moines. Transportation Co., D.C., 41 F. Supp. 798.

The testimony introduced at the trial is the best indication as to the true duties of these men.

Pages 195, 196:

"Q. But there are frequent occasions on which the ships (articles in shipment) are of such a size it takes the whole gang? A. Well, yes."

"Q. And the whole gang includes you, (the checker) the so-called caller and the wheelers? A. Yes, sir."

Nor can there be any doubt but what the checker himself is instrumental in the loading of these truck-trailers. Again we turn to the testimony of the case:

"Q. (Pg. 277) * * * He (checker) has the right to do anything he pleases, he runs the gang? A. Yes, sir."

"Q. (Pg. 617) * * * Who does control the loading with respect to weights of those trucks when they are being loaded? A. The checker."

"Q. (Pg. 631) Who is in charge, direct charge, immediate charge of the loading of the equipment at the Moran Terminal in Buffalo? A. The checkers are."

"Q. (Pgs. 640, 641) When the manager was reprimanded (when poorly loaded) what was he supposed to do?

"Q. (By the Court) What instructions were given with regard to the reprimand? A. Of course, the first thing would be to investigate who loaded the unit. That could be done either by checking the bills, because the checker's name would be on there, or by checking the checker's tonnage report, and when they developed who it was, he reprimanded the checker and explained to him the circumstances or the condition that it was loaded in and where it was improper, and to use corrective measures in the future. If by any chance he (checker) blamed it on a two-wheeler * * *"

"Q. (By the Court) You mean if the checker blamed the two-wheeler? A. It was never taken as any alibi for the checker was the boss and it was his responsibility to see the two-wheeler was properly instructed and that he was watched to see that it was loaded properly."

"Q. (Pg. 449) Now, Mr. Hays, aside from his duty of making checks on a piece of paper, what else does the checker do? A. The checker is entirely responsible for his men, that is to say, he must see that the freight is handled and put in the right bodies, that it is stowed properly, that it doesn't damage other freight, and the case of these dangerous articles that we have been talking about, that they are handled properly and stowed where they belong. He is also charged with seeing that the freight is not loaded in such a fashion that it is going to cause damage or injury to any of the employees or to the other freight and when it is pulled away from the dock that it doesn't tip over * * *."

"Q. (Pg. 463) Incidentally, isn't it the duty of the checker to do that, to save the light (freight) for the top and put the heavy (freight) on the bottom? A. Yes, sir.

"Q. Does that have to do with the safety of operation? A. Yes, sir.

"Q. Does it make any difference what part of the truck you put heavy freight or big pieces of freight? A. Definitely. We have had instances where trailers have collapsed right out on the road because they were loaded in the center of the body and not loaded right through, and we have had to send a crane to pick it up."

"Q. (Pg. 470) Now, then, this information as to the condition of the stowing that appears there, who is responsible for that information there? (Referring to Defendant's exhibit G—Checker's tonnage form) A. The checker."

"Q. (Pg. 535) Do you mean to say the checker actually goes into the body and places the goods there? A. There is nothing to prevent him from doing that. It is his duty to see that it is properly stowed. If his men can't do it themselves, and he can't see it is done, then he must go in there."

From the foregoing testimony it can be adduced that the "callers," "wheelers" and "checkers" are all engaged in seeing that semi-trailers are properly loaded for the highway. Under Ex parte No. MC–2, supra, these men are engaged in such loading which affects the safety of operation of the vehicle.

However, above and beyond the loading of these trailers for the road, these men have the duty of inspecting the condition of the vehicles for broken floors, sides, etc.

"Q. (Pg. 303) Regardless of what you may have said here on direct examination

in response to Mr. Rumizen's questions, do you still say right now that it wasn't your duty to make any inspection or have any responsibility with respect to the condition of the floor of these bodies? A. Well, I don't believe I ever made one of them out.

"Q. When you were a checker, you made these things out? (Referring to defendant's Exhibit G—Checker's tonnage report) A. I had to, as to the condition of the floor and the tarps.

"Q. Was it part of your duty to do that? A. Yes, sir.

"Q. And you say now that it was part of your duty, and you didn't do it? A. I neglected to do it.

"Q. But it was your duty to report on the floor of these trucks? A. Yes, to call the attention of the foreman to that."

"Q. (Pg. 305) One of the duties of the callers, of course, was that they make an inspection of the physical—a physical inspection of it and then call the checker's attention to it, wasn't it. A. Yes."

"Q. It was part of his duty then? A. I suppose it was; yes."

"Q. And you as a breaker, called the checker's attention to it if he didn't see it, didn't you? A. Well, I would tell him there were holes in the floor; that's about all."

"Q. Well, you would tell him about the holes in the roof, too, wouldn't you? A. Yes, the tarps."

"Q. (Pg. 575) Then the checker, as well as the caller and the stower, would be an inspector of that? (Defects in trailer) A. Yes, sir."

"Q. (Pg. 715) (To night boss) Do you go in and inspect the bodies to see if they are in good condition? A. I generally went by what my checkers reported on their checking sheets."

Thus the testimony shows that there was a duty on plaintiffs to make an inspection of the physical condition of defendant's bodies before they went out on the highway. The physical condition of the trailer affects safety of operation and, therefore, those who make this inspection in turn are engaged in an activity which affects safety of operation.

The third ground upon which this Court finds that these plaintiffs are engaged in the safety of operation concerns the labels placed upon certain shipments which the Interstate Commerce Commission has designated as dangerous articles. 41 Stat. 1444, as amended, 18 U.S.C.A. § 382 et seq. Undoubtedly many of these goods in transit are readily recognizable as dangerous, such as carboys of acid and storage batteries, but Congress in its wisdom has decreed that certain articles are to have placed on them various colored stickers which by their label and color can be readily identified as dangerous. Often these labels come off in shipment or possibly through neglect or oversight they are not placed on the carton in the first place.

"Q. (Pg. 440) I will ask you whether or not sometimes a shipper may put on labels on the shipments or packages (of dangerous articles) and fail to put it on his shipping order? A. Yes, sir.

"Q. And how do we find out about that when that happens, or what do we do, or what are the people supposed to do about it? A. When the checker gets the shipping order there is no notation as to the kind of label and the caller handles the freight and the label is on the freight, he tells the checker about it. That is one example. The other is, if the label is not on the freight and is on the shipping order then the checker applies both. He instructs one of his men to get a label and he puts it on the shipping order.

"Q. That is, he doesn't put the label on the shipping order? A. No, he puts a notation."

Correlated with this is the removal of leaking packages from the semi-trailer body.

"Q. (Pg. 138) I ask you, what do you do if you find any leaking packages, particularly leaking packages of dangerous articles with these labels on them? A. (By checker) Make a report on it."

"Q. (Pg. 217) Are you the fellow who caused them (leaking containers) to be taken out? Who determines that they are to be taken out of the body and not loaded on the body when they are found leaking? A. I do.

"Q. Who calls your attention to the fact that they are leaking? Does the breaker call your attention to that fact? A. If they are leaking he does.

"Q. If he sees them is it his duty to call it to your attention? A. Yes, he calls my attention to it if it is leaking, yes.

"Q. You may also notice that it is leaking yourself, or you may get your notice through him? A. That is right."

"Q. (Pg. 301) What about leaky packages that had labels on them; what did you do with those as a breaker? A. We took them outside the body and let them drip off the dock.

"Q. You did this as a protection against leaving them in the loads? A. We had to take them out.

"Q. You know that there are safety rules of the Interstate Commerce Commission respecting leaky cartons, don't you? A. Yes, sir.

"Q. And you know that it is required by law that you remove those from the load? A. We always did.

"Q. And those were part of your duties, to do that, as caller wasn't it? A. That is correct.

"Q. So that no leaky articles of a dangerous nature was in the load going out on the highway? A. That could be determined by the stower, too. Like going out in the terminal, if it was broke, the stower would take it out and put it on the dock.

"Q. * * * And do you notify the checker, like the checker testified here? A. Yes, we call the attention of him, to it."

There was also testimony as to the amount of dangerous articles shipped by the defendant. There is some dispute as to the amount, but there can be no doubt that with defendant's volume of business that there was a large amount of dangerous articles handled, and it is probable that enough were handled so that it is the usual rather than the unusual to handle dangerous articles daily.

In their union contract with defendant, plaintiffs are all termed "dockmen."

I am aware of the decision in Ispass v. Pyramid Motor Freight Corp., D.C., 54 F. Supp. 565, but I believe in view of the facts shown herein and the decision in Ex parte No. MC–2, supra, and United States v. American Trucking Association, supra, that this Court should now make its decision without awaiting possible action before the Interstate Commerce Commission.

Therefore, the following Findings of Fact are made:

1. "Callers" are employed in such a way that their work is that of unloading the trailer bodies and advising the checker of the nature. They actually handle freight.

2. "Wheelers" actually load the freight on the outgoing bodies.

3. The loading and unloading of these vehicles affects the safety of operation of the vehicles upon the highway.

4. "Checkers" directly supervise the actual loading and unloading, as well as counting the freight and reporting overage or underage in the shipments.

5. It is a duty upon all of them, that is, the "checkers," "callers" and "wheelers" to report physical defects and need for repair to the trailer body.

6. It is the direct duty of the "checker" to place labels on all unlabeled dangerous shipments, and it is the duty of the "callers" and "wheelers" to advise the "checkers" when labels are seen to be missing.

7. It is a duty of the "checkers", "callers" and "wheelers" to remove broken and leaking shipments from the body to prevent these dangerous articles from coming into contact with other freight.

8. It is the duty of the "checker" to properly distribute the incoming freight for proper and expedient reshipment.

9. The "checkers", "callers" and "wheelers" all devote a substantial amount of their time to these operations.

10. All of these operations directly affect the safety of operation of the vehicles upon the highway and in interstate commerce.

Therefore, it is concluded that the plaintiffs cannot recover, since they are within the type embraced by the exception in Section 13(a) of the Act, and the Complaint must be dismissed.