WHEELER LUMBER BRIDGE & SUPPLY COMPANY v.
SEABOARD SURETY COMPANY.
PAPER, CALMENSON & COMPANY v. SEABOARD SURETY
COMPANY.[1]

November 17, 1944.

Nos. 33,810, 33,811.

[1]Reported in 16 N. W. (2d) 519.

444

*Doherty, Rumble, Butler, Sullivan & Mitchell* and *Duward D. Staples,* for appellants.

*Paul C. Thomas,* for respondent.

JULIUS J. OLSON, JUSTICE.

Two cases are here for review upon appeals by plaintiffs from orders sustaining general demurrers to their complaints. The cases have been consolidated on appeal. Since both actions involve the same defendant, contract, and essential facts, we shall recite only the necessary allegations of the complaint in the Wheeler Lumber Bridge & Supply Company case, No. 33,811.

Plaintiff, a materialman, on July 6, 1942, furnished certain material purchased and used by D. F. McElroy & Company in performing a contract for the construction of certain concrete box culverts on a state highway. The contract was entered into August 19, 1941. Defendant is the surety on the performance bond. The contractor failed to pay the price or value of the material so furnished, and this action was brought against the surety. Certain events, chronologically listed, may be of aid to decision.

On July 15, 1942, the contractor's work was finished and the equipment removed from the job. The highway department has since been in complete possession and control of the highway, and no one has suggested that the contractor failed in any way to perform. On August 10, 1942, the project engineer executed what is referred to as "Contract Voucher No. 9 (Final)," certifying "that the items of work shown in the Statement of Work Performed herein have been actually furnished for the work comprising the above-mentioned projects in accordance with the plans and specifica-

tions heretofore approved." On September 25, 1942, defendant "as surety for D. F. McElroy & Company, Contractor on the above referenced project and contract, do hereby consent to final payment for work performed." On September 26, the district engineer certified "that a final examination has been made of the above noted contract, that the contract has been completed, that the entire amount of work shown in this final voucher has been performed and the total value of the work performed in accordance with, and pursuant to, the terms of the contract is as shown in this final voucher." On October 3, the contractor certified "that he has performed and completed all the work described herein in accordance with and pursuant to the terms of his contract, and does hereby accept this final voucher as being correct, full and complete and does make claim for final payment on this contract in accordance with this final voucher." On October 6, the construction engineer certified to the "completion" of the contract and that "The total value of the work set forth in this final voucher is in accordance with the terms of said contract." On the same day, the chief engineer recommended "the above contract for acceptance and final payment." On October 7, the commissioner of highways "approved" the voucher "for final payment and the work is accepted." On December 9, plaintiff filed with the commissioner of insurance a notice of claim in accordance with the provisions of Minn. St. 1941, § 574.31 (Mason St. 1940 Supp. § 9705). The precise question here is whether this notice was filed within the time limited by that statute. So far as here material it reads:

"No action shall be maintained on any such bond unless within 90 days after the completion of the contract and *acceptance thereof by the proper public authorities,* the claimant shall file a written notice specifying the nature and amount of his claim and the date of furnishing the last item thereof * * *." (Italics supplied.)

Obviously, the contract was completed in July. No one claims otherwise. When was it *accepted* "by the proper public authorities"? Defendant contends that it was accepted in July; plaintiff

that it was not accepted until October 7, and hence that the notice was filed in due time.

When, on July 15, the project engineer concluded that the job was finished and he then informed the contractor that the men and equipment could be removed from the job, there still remained important matters to be done. Obviously, computations then had to be made of work done and material used in the performance of the job. Partial payments had to be checked in order that the final balance due the contractor might be arrived at. And, as we have seen, on August 10 the project engineer, having finished his computations, executed, "in the course of his employment and in accordance with the customary and usual procedure" of the department, the final estimate. Within it many facts are included. There we find that the original contract price of $13,424.35 had been increased to $21,415.02 because of extra work and supplemental agreements made relating thereto. The engineer credited to the state "previous payments" amounting to $19,593.32, thus leaving as the "net amount due" the contractor $1,821.70. This was the amount to the final payment of which defendant, "as surety," consented on September 25 "for work performed" on this job by its principal.

Then, too, we have the department's rules and "specifications for highway construction." These are integrated into its procedural forms as requirements. Under Section 1907.2 thereof, termed a "Final Acceptance," the engineer on the job is required to "make a final inspection of the entire work, and he will certify in writing as to the said completion, after which he will prepare a final estimate containing quantities of each and every item of work performed by the Contractor." Estimates upon which payments have been made "are partial estimates and are subject to correction in the final estimate." Section 1908, labeled "Final Payment," provides:

"Upon the execution of 'The Certificate of Final Acceptance' by the contractor and his presentation of the written approval of the Surety or Sureties, the state will make final payment; * * *."

The highway department has extensive and widespread activities to promote and protect. Within its large personnel are many men of special training and qualifications. Sums running into millions of dollars are annually spent in the maintenance and enlargement of its highway programs. In the language of the trial court:

"* * * What is involved is the efficient administration of a department of government. .

\* \* \* \* \*

"* * * The public 'authorities' must ascertain the fact of the completion of the project; having determined that the project has been completed according to contract, they are in duty bound to accept it; having accepted the project they must ascertain the true value of the work and material furnished; and having arrived at an agreed figure for these items, they must be sure that there are no offsets, counterclaims or unfulfilled covenants; and after all the 'foregoing' have been checked agreeably to the contractor, the obligee and the surety, then the net amount due must be paid out of the highway fund."

That plaintiff's notice of claim was filed with the commissioner of insurance in the form required by statute is clearly shown. If timely filed, the demurrer should have been overruled. Upon timeliness of filing this action hinges. When did the 90-day period of limitation begin to run? Clearly, the statute requires both *completion* of the contract and *acceptance* of the job before the limitation begins. Here, time of completion is not an issue; only the *time of acceptance* is.

This contract, like numerous others entered into by the highway department, was made and performed pursuant to and in accordance with the standardized procedure promulgated by it. Because of the extensive scope of the department's activities, it seems highly desirable that the *time of acceptance* should be made certain and readily available to those who have performed labor or furnished material on the job. The performance of a highway contract may, and frequently does, involve extensive areas and require many

months for completion. Where and to what office or officer must a claimant go to ascertain when the statutory period of limitation has begun? In this case, was there an *acceptance* by the state when the project engineer orally informed the contractor that he could remove his men and equipment from the job? There was then nothing in writing that acceptance was intended as a matter of finality by any authorized officer representing the state. So July 15 cannot be said to have been the date when the limitation was started. Nor can it be said that August 10 set the statute in motion. There still might be need for further investigation and checking of the job. As suggested by the trial court, there may well have been need for further investigation of "the true value of the work and material furnished"; ascertainment of the value of extra work done and material used therein; the department "must be sure that there are no offsets, counterclaims or unfulfilled covenants"; only "after all the 'foregoing' have been checked" and found to be correct and agreeable to the "contractor, the obligee and the surety" is the amount due the contractor to "be paid out of the highway fund." If defects had appeared or it was discovered that items had been improperly charged, obviously the July and August dates would not have been controlling. We think the department's promulgation of rules, regulations, and "specifications" setting out the procedural steps to be taken in all cases of this kind are appropriate and desirable, since thereby the exact *time of acceptance* is made certain, and no materialman or laborer interested in its ascertainment need go astray in determining with exactness when his notice must be filed.

Under the mechanic's lien law, the claimant is required to file his lien statement within 90 days after the furnishing of the last item of work done or material furnished by him. As such, it is clearly within his own knowledge as to the time when he must protect his claim if he expects to utilize the lien provisions of the statute. Defendant's theory leaves no sure guide. In fact, there is nothing approximating certainty of time within which one must act. That, surely, is a situation to be avoided.

The statute with which we are dealing relates to the remedy to be sought and applied rather than to any basic rights between one in plaintiff's position on the one hand and the contractor and his surety on the other. Being remedial, the act should be (Ilg Elec. Ventilating Co. v. Conner, 172 Minn. 424, 426, 215 N. W. 675) "liberally construed and only a·substantial compliance exacted as a condition precedent to the maintenance of an action on the bond." And in the interpretation of the act our duty is to construe the statutory language so as to give effect to the legislative intent. United States v. American Trucking Assns. Inc. 310 U. S. 534, 542, 60 S. Ct. 1059, 1063, 84 L. ed. 1345, 1350.

It is true, as contended by defendant and sustained by the trial court, that certain language appears in Guaranteed Gravel & Sand Co. v. Aetna Casualty & Surety Co. 174 Minn. 366, 219 N. W. 546, which at first blush seems to sustain their position. The deciding factor in that case was whether the building had been *completed* within the 90-day provision. What the court said of *acceptance* was not necessary to decision. The pivotal point of lack of completion was decided against defendant's argument, that there had been substantial performance of the contract and that much more than 90 days had elapsed before the required notice was served. On that phase the court said (174 Minn. 371, 219 N. W. 548) :

"\* \* \* That doctrine [of substantial performance] is wholesome as applied between the owner and the contractor where abatement may be had to the owner for deficiencies on the part of the contractor. But to hold that while the work is still proceeding the acceptance of it in an incomplete state is sufficient to put in operation the 90-day limitation in the statute in actions of this character would lead to unreasonable results never within the contemplation of the legislature [citing cases]. *In a case of this character there must be a complete, literal, strict performance of the contract.*" (Italics supplied.)

The court's first syllabus paragraph states the nub of the decision in this form (174 Minn. 366, 219 N. W. 546) :

"The evidence is sufficient to sustain a finding that the construction of the building was not *completed* 90 days prior to the service of the notice pursuant to [G. S. 1923] § 9705." (Italics supplied.)

Here, as we have shown, the parties by their conduct and written engagements had agreed that finality of acceptance was to await the commissioner's final word. He and he alone executed the contract on behalf of the state. Absent any showing that he intended any of his agents or appointees to take his place by delegation· of authority or otherwise, it follows that the commissioner's act is the one to which we must look to ascertain the true date of final acceptance.

The orders sustaining defendant's demurrers are accordingly reversed.

