UNITED STATES *v.* J. E. BERNARD & CO., INC. (No. 4811)[1]

United States Court of Customs and Patent Appeals, November 9, 1954

*Warren E. Burger,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument October 14, 1954, by Mr. FitzGibbon and Mr. Schwartz]

Before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, and COLE, Associate Judges

O'CONNELL, Acting Chief Judge, delivered the opinion of the court:

The appellee imported from Canada at the port of Chicago certain merchandise described on the consular invoice as Bakelite agitators. They were for use as parts of electrical washing machines and were classified and assessed with duty by the Collector of Customs at the rate of 35 cents per pound, and 30 per centum ad valorem, under paragraph 1539 (b) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, which reads:

> 1539 (b)  Laminated products (whether or not provided for elsewhere in the Tariff Act of 1930 than in paragraph 1539 (b) thereof) of which any synthetic resin or resin-like substance is the chief binding agent, in rods, tubes, blocks, strips, blanks, or other forms_____ 25¢ per lb.
> and
> 20% ad val.

[1] C. A. D. 573.

1539 (b) Manufactures wholly or in chief value of any product of which any synthetic resin or resin-like substance is the chief binding agent, not including manufactures wholly or in chief value of any laminated product provided for in paragraph 1539 (b), Tariff Act of 1930_____35¢ per lb. and 30% ad val.

On the hearing before the United States Customs Court, the importer relied upon the claim, among others, that paragraph 1539 (b), as modified, is not applicable to the merchandise at bar and that it is properly dutiable at 17½ per centum ad valorem under paragraph 353 of the said Act, as modified by the trade agreement hereinbefore described, as parts, in chief value of metal, of electrical washing machines, by virtue of the similitude provisions of paragraph 1559.

That claim was sustained by the court below which in so doing invoked the doctrine established by this court that the language of the statute "manufactures of" presupposes the material of which the imported article is made or manufactured, exists before the article itself comes into existence, and held that the material from which the agitators here in issue were produced had no pre-existence until the agitators themselves were removed from the mold by which they were formed, citing *Cohn & Lewis* v. *United States*, 25 C. C. P. A. (Customs) 220, T. D. 49335.

From the judgment entered in conformity with that decision, C. D. 1582, the Government has taken this appeal, contending primarily, that the agitators in issue are in fact manufactures wholly of a product of which synthetic resin is the chief binding agent. Moreover, there is a presumption of correctness attaching to the classification of the collector to the same effect.

The importer does not deny that Bakelite is a product of which synthetic resin is the chief binding agent. Nor is there any question as to how it was made or used. The question presented is thus purely one of statutory construction based upon the undisputed facts established by the record. The trial court in reaching its conclusion acknowledged in its decision that "According to the uncontradicted evidence, a molding compound, consisting basically of synthetic phenolic resin and finely ground cotton linters, is purchased in powder form by the exporter herein from the manufacturer of such compounds." The uncontradicted testimony and evidence disclose further that Bakelite exists independently as a molding compound which is purchased by molding companies and formed into various articles, such as Exhibit 1, a sample of the imported agitators offered in evidence by appellee at the trial; that Exhibit 1 is produced, not from powder as such, but from various pellets identified in the record as Exhibits 2, 3, and 4, with reference to which counsel for the Government accurately and succinctly state in their brief:

The facts therefore, without any conclusion, are that a Bakelite molding compound, consisting of about 80 to 90 percent cotton linters as filler, and about 10 to 20 percent synthetic resin, as the binding agent, is purchased by the producers of the agitators herein. After measuring sufficient compound to make one agitator it is formed by pressure of about 20 tons into three pellets. These pellets are then placed in a mold and with heat of about 300 degrees Fahrenheit and pressure of about 300 tons the pellets become first a molten mass and then harden into the form of the mold. The result in this case is a Bakelite agitator.

The statement of facts just quoted from the Government's brief are fortified and supported by the following excerpts from the testimony of E. R. Watson, who made the agitators for the exporter in the instant case:

Direct examination by MR. SCHWARTZ:

Q. I show you a box containing two pellets and ask you if pellets such as these are used in producing Exhibit 1? A. They are.

MR. SCHWARTZ. Well, then, I offer this in evidence as Plaintiff's Illustrative Exhibit 4.

MR. ANTUS. No objection.

Judge FORD. Let it be marked.

\* \* \* \* \* \* \*

By MR. SCHWARTZ:

Q. Will you explain how the pellets, such as Exhibit 4, are used in producing the agitators, such as Exhibit 1? A. Yes. There is one other type of pellet which you may wish to see and it is in my brief case. If it is required as evidence, there's actually 3 pellets to make that.

Q. It looks like the others? A. Yes. It is a different type. The other pellet is broken. First of all, let me explain the mold. The mold is two pieces of steel; the female section having the contours of the outside of the agitator; the male portion having the contours of the inside of that agitator. That mold is heated at temperatures of approximately 300 degrees Fahrenheit and is operated under pressures of approximately 300 tons. Now, one pellet is broken and is put down into the small portion of that mold which forms the top uppermost portion of the agitator right in there; the other two pellets which are in the box are set directly over that; just placed on top of it. The mold closes. The male portion comes down on to that material. The pellets break and the mold continues to close up. As the mold closes and that heat and pressure is applied to the material, the material takes the form of a molten mass; it might be described similar to molasses. It flows into the various corners and crevices of the mold and the mold is held there for a period of 4 minutes while that material is allowed to cure where the chemical reaction of the heat and the pressure on the material turns it into a solid homogeneous mass.

Q. Is that a bond or how would you describe it, bonding or binding? A. Yes, I believe you could describe it that way.

Q. As a result of that heat and pressure that you have described and the subsequent hardening, does the synthetic resin become a binding agent in the agitator? A. It does.

Q. Now, is there any binding agent in the pellets, Exhibit 4? A. No.

Q. Do you mean by that that does not have a binding agent that keeps it together? A. No; it is simply the cohesion of the material after it is subjected to pressure that holds that together.

Q. Does the synthetic resin which is present in the pellets act as a binding agent in the pellets? A. No.

Q. Do you produce the pellets? A. We do.

Q. How is that done? A. It is done by weighing the powder which we purchase and then putting it into a mold which is operated at room temperature and simply pressed and the pressure may be 20 tons.

Q. Well, is there anything about these pellets which indicates to you that it does not have a binding agent? I mean, what happens to the pellets when they are left alone or when they come in contact with other objects? A. If they were allowed to drop on the floor or something of that sort, they would break or you could crumble them in your hands. They are not bound to that extent.

Q. And, that would not happen if there were a binding agent at all in the pellet? A. I think that is exemplified in comparing the two agents; the agitator agent has taken effect. You can drop that and it wouldn't break. It is properly bound with the synthetic resin.

Q. Whereas the pellet does disintegrate? A. That's right.

Mr. Schwartz. Your witness.

Cross-examination by Mr. Antus:

XQ. Sir, are you a chemist? A. No; I am not.

XQ. Have you made tests of this material in the laboratory? A. In what way?

XQ. To analyze it, whether the pellets or the material from which this Exhibit 1 is made? A. We don't test it in any way, no.

XQ. Can you tell the Court why you use the pellets instead of the powder? A. It is merely a convenience in that the powder is measured prior to molding. If that powder were taken to the press where the agitator is operated, it would take that operator additional time to weigh out the required material to make an agitator; furthermore, if loose powder were put into that mold, it is liable to burn on the mold before it could get flowing properly.

XQ. Did you see this exhibit manufactured? A. Yes; I have made them myself.

XQ. But, I say, this identical one? A. No; I couldn't say I saw that identical one. I don't see them all being made but I have seen those agitators being produced.

XQ. Is there a difference between plastic and bakelite? A. The term Bakelite is a trade name for plastic products made by the Bakelite Corporation.

*     *     *     *     *     *     *

XQ. I show you this Exhibit 1 again and ask you whether you can give us the component parts by percentages, whether resin or whatever it is made of? A. It is a combination of the resin and filler which I stated previously I would guess to be approximately 90 or 80 percent filler and the remaining percentage resin.

The facts hereinbefore set forth clearly establish that the pellets constituted an unactivated molding compound or article of commerce known as Bakelite of which synthetic resin was the chief binding agent; that the product was bought and sold in the convenient form in which it was utilized for the sole purpose of molding it into agitators or a multitude of other plastic articles by the simple expedient of applying heat or heat and pressure. Hence the court below erroneously reached the conclusion that there existed no independent product of which synthetic resin was the chief binding agent prior to the formation of the agitators by the application of heat and pressure to the molds in which the imported merchandise was molded and produced.

Counsel for the Government further urges that the doctrine of "pre-existing material" is merely one of statutory construction which must give way to the intention of the law makers with respect to the new

legislation appearing for the first time in the Tariff Act of 1930 as disclosed in the following quoted excerpts from the Report of the Finance Committee of the United States Senate. See Calendar No. 42, 71st Congress, 1st Session, Senate Report No. 37, page 52 under the heading "Paragraph 1539 (b)—Synthetic Resin":

> The phrase "or of any other product of which any synthetic resin or resinlike substance is the chief binding agent," has been inserted in order to make specific provision for an important group of products known as molded products. These are made by molding under heat or heat and pressure a mixture containing synthetic resin or a resinlike substance and a filler, such as wood flour and pigments.
>
> Molded products included in this provision cover a wide range and are used chiefly in electrical or mechanical machinery where requirements of electrical insulation properties, mechanical strength, exactness of form or size, and resistance to destructive agents, render them of peculiar importance. These molded products find a multitude of uses.

The terms of the provisions of paragraph 1539 (b) appear to be plain and unambiguous and, as urged by appellee, there appears to be little or no room for resorting to the legislative history of the enactment. There is, however, "no rule of law" which forbids this or any other court from having recourse to the Report of the Senate Finance Committee in cases like this in order to verify its position and demonstrate that there is no ambiguity in the language of the enactment. *United States* v. *American Trucking Ass'ns.*, 310 U. S. 534, 542; *Universal Transcontinental Corp.* v. *United States*, 40 C. C. P. A. (Customs) 54, 57, C. A. D. 497.

In view of the conclusion hereinbefore stated, it is deemed unnecessary to state and pass upon other points raised by the respective counsel, and the judgment of the United States Customs Court is accordingly *reversed*.

WORLEY, J., dissents.

On account of illness, GARRETT, C. J., did not participate in the hearing or decision of this case.