(C.D. 2557)

SORKIN ENTERPRISES *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 21, 1965)

*Sharretts, Paley & Carter* (*M. Barry Levy* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Herbert L. Warren* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before RAO and FORD, Judges

RAO, Chief Judge: Certain imported merchandise, invoiced as "polyvinyl chloride floor covering," was classified by the collector of customs at the port of New York as manufactures, wholly or in chief value of jute, not specially provided for, within the purview of paragraph 1023 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and, accordingly, was assessed with duty at the rate of 19 per centum ad valorem or at the rate of 18 per centum ad valorem or at the rate of 17 per centum ad valorem, depending upon the date of entry or withdrawal from warehouse.

It is the claim of the plaintiff in the instant protests, which have been consolidated for purposes of trial, that the merchandise at bar responds literally to the designation "felt-base floor coverings" in paragraph 1021 of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and, therefore, it is dutiable at the rate of 12½ per centum ad valorem.

The trade agreement modifications of the provisions here in issue are as follows:

Paragraph 1023 of the Tariff Act of 1930, as modified, *supra*—

All manufactures, wholly or in chief value of vegetable fiber, except cotton, not specially provided for:

| | | | |
|---|---|---|---|
| Manufactures wholly or in chief value of flax or jute_____ | 19% ad val. | 18% ad val. | 17% ad val. |

Paragraph 1021 of the Tariff Act of 1930, as modified, *supra*—

All other floor coverings not specially provided for:

| | |
|---|---|
| Felt-base _____ | 12½% ad val. |

Through the medium of the testimony of the owner of the plaintiff firm, a sample of the imported product (plaintiff's exhibit 2), and certain advertising matter describing the appearance and properties of the item in question (plaintiff's exhibits 1 and 3), plaintiff sought to establish that the merchandise at bar is felt-base floor covering within the intendment of the provisions of paragraph 1021, as modified, *supra*.

According to plaintiff's witness, Harry W. Sorkin, plaintiff is an importer and exporter of various products, including floor coverings, such as vinyl tile, asphalt tile, linoleum, vinyl asbestos, and the merchandise at bar. It appears, however, that floor coverings constitute a minor portion of plaintiff's business activities, and that plaintiff's transactions were a very insignificant factor in the floor-covering trade at large.

The subject item, which was invoiced as polyvinyl chloride floor covering, 36 ounces, was purchased by the plaintiff from a firm in England, and imported and marketed in the United States for a little over a year, commencing in 1956. It was sold by the importer to some 75 to 100 purchasers in the States of New York, Illinois, Massachusetts, Maryland, Washington, New Jersey, Florida, Georgia, Texas, Missouri, and in the District of Columbia and Puerto Rico.

The witness stated that he had seen this material used as a floor covering in a hotel in Fitchburg, Mass., in haberdashery stores, an office building, and in homes in Manhattan and Brooklyn, N.Y., in a carpeting establishment in Astoria, Long Island, and in Chicago, Ill., on about 30 occasions, and knew of no other use than as a floor covering. In that application, it can be laid over almost any type of existing floor; it can be attached with any mastic adhesive or other glue; it can be tacked down like a carpet; it is easily installed; can be cut with an ordinary shears; and washed with soap and water.

Mr. Sorkin described the subject merchandise as follows:

This is a floor covering which consists of a polyvinyl chloride top with a jute felt base laminated to the rear of the polyvinyl chloride. It is what we call a floral embossed pattern and in the processing, it is embossed with sort of a die and they stamp it out. It is rolled off the machine and it is made—now it comes in 27 inches and a 54 inch width, that is the way I believe we imported it, and it is in rolls if I recall of anywhere from 40 up to 70 or 100 feet rolls.

\*        \*        \*        \*        \*        \*        \*

The base is a matted jute felt.

It was Mr. Sorkin's opinion that felt is any fabric which has been matted under compression, with the addition of a chemical to impart adhesiveness, regardless of material. In this context, he considered the imported product to be a floor covering with a jute felt-base, and believed it was so regarded by all floor covering people. He offered

plaintiff's exhibit 3, an advertisement by R. H. Macy & Co. of New York City, as a reference to this material as a floor covering with the appearance of a carpet with a jute felt-base.

On cross-examination, Mr. Sorkin insisted that the merchandise at bar is referred to in the trade, by wholesaler and retailer, as a floor covering with a polyvinyl top and a jute felt-base—a felt-base floor covering. He defined such an item as a floor covering which has a base of felt attached or laminated to the surface, which does not necessarily involve the use of asphalt; that is to say, "any floor covering which has a felt base, which has felt as its base in the terms of the trade." To the extent that the definition of felt-base floor covering, in the 1948 Summaries of Tariff Information, volume 10, page 98, provided only for floor covering "made of rag felt which is saturated with asphalt, painted on both sides, and then printed on the top or wearing surface with designs or patterns," Mr. Sorkin believed it did not fully define felt-base floor covering.

In the opinion of this witness and predicated upon his understanding of the trade's concepts, neither defendant's exhibit A nor defendant's exhibit B would be considered to be felt-base floor covering. He would call them both linoleum with an asphalt backing. While he did not believe that all floor coverings with a felt-base would be referred to in the trade as felt-base floor covering, the only reason he could give for calling plaintiff's exhibit 2 felt-base floor covering is that it has a felt-base.

The three witnesses for the defendant were of a directly contrary view as to the meaning of the term "felt-base" as applied to floor covering and as to whether or not the merchandise at bar consists of felt-base floor covering. These witnesses were Jules I. Blumberg, a wholesale distributor of floor coverings since 1919, who had imported and sold all types of foreign and domestic floor coverings, including linoleums, throughout the United States; Marshall Spector, vice president and sales manager of the American Biltrite Rubber Co., who has been personally and directly connected with the production of hard-surface floor coverings since 1946, and William L. McBride, a salesman and of late also a buyer for the firm of William Goodacre & Sons, which company imports and wholesales floor coverings.

Mr. Blumberg's experience with trade terminology in the floor-covering industry embraced felt-base floor covering and linoleum. He described plaintiff's exhibit 2 as a polyvinyl chloride surface adhering to jute-felted material, the surface of which was embossed to create a design. He stated that this material was not in existence in 1930, and, therefore, could not have been then considered a felt-base floor covering. Nor would he now consider it to be such. Moreover, he could not believe that any merchant would so describe it.

Mr. Blumberg identified defendant's exhibits A and B as products which he had bought and sold for many, many years in sizable quantities and had seen produced on many, many occasions in both domestic and foreign mills. He described both exhibits as printed felt-base floor covering which is not known in the trade as linoleum.

In the opinion of this witness, felt-base floor covering would consist of the following:

The base of it would be most often asphalt saturated felt, at times paper, at times felt made of rags, and frequently a combination of both, depending on the raw material market conditions. And this felt, asphalt saturated felt backing material, is then coated on the surface with some paint and the design printed on the surface either by one method or another. * * * Then the back of the felt base is coated with paint for identification and easy installation.

This was consistent with the definition contained in the 1948 Summaries of Tariff Information as read into the record, but not with the definition given by plaintiff's witness; and Mr. Blumberg did not believe that the floor-covering trade would agree with Mr. Sorkin's definition. He did not think that merely placing a felted material on the back of a floor covering would make it felt-back or felt-base, which terms could be used interchangeably. What plaintiff's exhibit 2 was, according to this witness, was a felt backing added to a polyvinyl surface, a product entirely different from the felt-base or felt-backed floor covering known in the trade as felt-base floor covering. In fact, he was not even sure that plaintiff's exhibit 2 is a floor covering. He had never seen it used as such, and thought it might be a wall, ceiling, or furniture covering. Assuming, however, that it be considered a floor covering, it differed from defendant's exhibits A and B in that it was composed of an entirely different surface material, had a different type of backing material and a different basis for establishing the surface design. Furthermore, all felt-base floor covering is made with asphalt, and plaintiff's exhibit 2 is not.

This witness produced a sample of linoleum, received in evidence as defendant's exhibit C, which, he stated, was an entirely different product than felt-base floor covering and distinguished therefrom in the floor-covering trade.

On cross-examination, Mr. Blumberg testified that, while he is not presently a member of any floor-covering trade associations, he has in the past been a member of such an association in Boston, Philadelphia, Pittsburgh, and New York. He identified the floor coverings he had sold as including felt-base printed linoleum, inlaid linoleum, marble linoleum, sheet linoleum, and carpets and rugs made of many different fibers. He described plaintiff's exhibit 2 as a vinyl product with a felt-back, which could be used as a floor covering. He preferred to refer to the material on the reverse side as a backing rather

than a base, and so, too, would he describe linoleum, since this was common trade terminology. However, he admitted that the terms "back" and "base" could be used interchangeably. Generally speaking, Mr. Blumberg stated, floor coverings would be referred to by the surface material rather than the backing since the surface material ordinarily has infinitely greater value. Felt-base floor covering is an exception.

Defendant's witness Spector testified that his company had sold felt-base floor covering throughout the United States and in Canada and Mexico. He identified defendant's exhibits A and B as felt-base floor covering, which, he stated, in the general terminology of the trade would be called linoleum. This is a designation which refers to sheet hard-surface floor covering. Felt-base floor covering, according to Mr. Spector, is made on a saturated felt back, with a painted, enamelized, decorated surface, which normally gives very short wear and is called a temporary floor covering. It can be saturated either with asphalt or with a resinoid type of material. Inlaid linoleum, such as exhibit C, is a more expensive, permanent product which is made with composition applied to a saturated felt or burlap back.

Mr. Spector had no experience with a soft-surface product like plaintiff's exhibit 2, but was of opinion that it would not be considered a felt-base floor covering in the trade. In his opinion, the term "felt-base" identified a specific type of product, to wit, a printed, decorated, painted surface on a saturated felt-back material.

Defendant's witness McBride testified that his company imported merchandise like defendant's exhibits A and B, which he identified as felt-base floor covering. According to this witness, the trade would define felt-base floor covering as a printed piece of goods on felt, but he had no technical knowledge of its manufacture. He had seen samples of material like plaintiff's exhibit 2 in England, but never in this country. Mr. McBride agreed with Mr. Spector's definition of felt-base, but expressed the opinion that except in the retail trade, it would not be referred to as linoleum.

This witness stated, on cross-examination, that he did not believe that material like plaintiff's exhibit 2 could be sold in this country, that exhibit 2 would be called felt backed, that he did not use the terms "base" and "backing" synonymously, and that he would not consider a floor covering to be felt-base if the surface was not printed.

Predicated upon the evidence which it introduced at the trial of this action, and the absence of proof or claim of commercial designation, it is the position of the plaintiff herein that the common and literal meaning of the term "felt-base," as applied to floor covering, and as used in the trade agreement provision, *supra*, embraces all floor covering in which the surface is attached to a felt backing. Therefore, and

since it is established that the backing of the subject merchandise is felt, it is claimed that said merchandise is felt-base floor covering.

Defendant, on the other hand, asserts that it was not the intent of the negotiators of the trade agreement provision for felt-base floor covering to provide for a class or kind of floor coverings by category or description, but that what was in fact provided for was a distinct and definite product having a hard-painted, decorated surface similar in appearance to linoleum.

The particular language invoked by plaintiff for the claimed classification of the instant merchandise is a designation inserted into tariff law exclusively by trade agreement negotiation. It was first carved out of the provision for "All other floor coverings not specially provided for," in paragraph 1021 of the Tariff Act of 1930, by the negotiators of the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T.D. 49753, and was repeated *in haec verba*, except for the rate of duty assessable, in the General Agreement on Tariffs and Trade, *supra*.

There is no dearth of explanatory material to disclose the sense in which the trade agreement negotiators apparently understood the term "felt-base" in connection with floor coverings. Whether or not they acted in accordance with this information and intended to limit the construction of the term to the explanation provided them is the question which remains at issue in this case. In the last analysis, it is the intention of the framers of a statutory provision which must govern its construction. *United States* v. *Clay Adams Co., Inc.*, 20 CCPA 285, T.D. 46078.

In the consideration of this problem, it is the contention of plaintiff that there is no ambiguity in the meaning of the term "felt-base floor coverings" and that, therefore, there is no occasion to resort to the history of the provision for data bearing upon the intent of the negotiators in the use of that expression. Counsel cites and relies upon the case of *C. J. Tower & Sons* v. *United States*, 41 CCPA 195, C.A.D. 550, as presenting an analogous situation to that at bar.

The merchandise before the court in the cited case consisted of an alloy, in ingot form, of aluminum and silicon, containing certain impurities. It was classified as aluminum silicon in paragraph 302(j) of the Tariff Act of 1930, but was claimed to be more appropriately provided for in paragraph 374 of said act, as modified by the General Agreement on Tariffs and Trade, *supra*, as an alloy in crude form in which aluminum is the component material in chief value. It was the contention of appellant in said case that, as evidenced by the history of the provision, the aluminum silicon provided for in said paragraph 302(j) was, by congressional intendment, limited to such as consisted

99

of metallurgical alloys used exclusively in the manufacture of industrial alloys and did not embrace material such as there in issue, which was an industrial casting alloy. The court found the argument to be without merit, since it could discern no ambiguity in the language of the provision, and clearly considered the merchandise before it to be aluminum silicon within the common meaning of that term. Accordingly, the court deemed it unnecessary to resort to the history of the provision for aid in its interpretation, stating:

Of course, it is well known that the master rule in the construction of statutes is to interpret them so as to carry out the legislative intent. *The United States* v. *Clay Adams Co., Inc.*, 20 C.C.P.A. (Customs) 285, T.D. 46078. It is equally as well known that legislative history may not be resorted to when the language of tariff statutes is plain and unambiguous. When the language used in a statute is so ambiguous that it cannot be properly determined under which paragraph Congress meant merchandise to be classified, then resort to legislative history is proper. *Stoeger* v. *The United States*, 15 Ct. Cust. Appls. 291, T.D. 42472.

It is clear to us from a reading of the statute that Congress intended that the involved merchandise should be classified as "aluminum silicon." The provision for that material is clear and unambiguous and not restricted by use or any other qualification.

While it thus appears that the court was of the view that, in the absence of ambiguity, it is unnecessary to consider extraneous data to assist in the interpretation of statutory language, it, nevertheless, thereafter observed that it had examined the legislative history of the provision and found nothing therein to support the position taken by appellant in the case.

It does not seem to be so clearly evident, as plaintiff asserts in this case, that the designation here in question is susceptible of a plain and literal construction which embraces all floor coverings having a felt-base, or that the common meaning of this expression is so obvious as to preclude reference to tariff history to cast light upon its intendment. In the first place, the precise phraseology of the provision tends to strip plaintiff's argument concerning its all-embracive scope of much of its cogency. The designation invoked is not "felt-base floor coverings," as the argument suggests. Rather is the provision one specified under the general category of "All other floor coverings not specially provided for" as simply "Felt-base." Whether this expression is elliptical and intended as an adjectival modifier of the words "floor coverings" not again repeated or whether the hyphenated expression was employed in the nominative to provide for a specific product seems not so readily ascertainable as plaintiff would have us believe. Certainly, it leaves open for speculation whether or not something other than the literal interpretation urged by counsel for plaintiff was actually intended. To that extent, we find sufficient

ambiguity in the language of the provision to make relevant any tariff history which may serve to explain its meaning. But even if it were not, we know of no rule of law which requires the court to ignore such history if it is available and will serve to illuminate perplexing statutory phraseology or reveal the intent with which it was written into law. *United States et al.* v. *American Trucking Associations, Inc. et al.*, 310 U.S. 534.

The expression "felt-base" in connection with floor coverings seems initially to have been discussed in a publication entitled "United States Tariff Commission, Washington," "Tariff Information Surveys On Articles in Paragraphs 1020 and 1022 of the Tariff Act of 1922," "Linoleum And Floor Oilcloth," on page 33, as follows:

### Section III

### FELT-BASE FLOOR COVERING

TARIFF ACT OF 1922, SCHEDULE 10, PARAGRAPH 1022 * * *

all other floor coverings not specially provided for, 40 per centum ad valorem

### DESCRIPTION, USES, AND METHOD OF MANUFACTURE

The felt used in the manufacture of felt-base goods is a rag felt, similar to but of a somewhat better grade than roofing felt. The felt is first inspected, then passed over heated cylinders to dry it out and also put it in better condition to absorb the hot asphaltum, into which it is then passed. The asphaltum is kept at a high temperature (about 400° F.) and the tank holding it is equipped with a number of rollers so arranged as to cause the felt to travel a considerable distance in the hot asphaltum. As the felt emerges from the bath it is passed between two rollers which squeeze out the surplus asphaltum. After cooling and drying, the felt is next coated on one side with paint, usually red. The side painted red is the back. The felt is next hung in a heated room, known as a stove, for a few hours, generally over night, then led back to the coating room for the application of light-colored paint on the front, or wearing surface. These coatings prevent seepage of the asphaltic oils from the felt, and the front coating also provides a smooth surface and receptive color field upon which designs are subsequently printed. Following the printing, the felt is again passed into the stoves for the purpose of drying and hardening that surface.

Felt-base products are not made in plain or solid colors, but are ornamented by designs which are printed on them with oil paint. The printing is done by what is known as a flat-block printing machine. (See illustration facing p. 11.)

In the "Summary of Tariff Information, 1929, on Tariff Act of 1922," pages 1666 and 1667, felt-base floor covering is described as follows:

### FLOOR COVERINGS, N.S.P.F.

The bulk of imports under the classification "floor coverings, n.s.p.f.," are probably rice-straw rugs from Japan. Other types of floor covering of which there is a substantial domestic production and imports of which would probably be dutiable under this classification, are felt-base floor covering and rubber tile. * * *

* * * * * * *

## (B) FELT-BASE FLOOR COVERING

*Decription and uses.*—Felt-base floor covering with a base of asphalt-saturated rag felt is similar to floor oilcloth with a base of burlap.

Felt-base floor covering is made by coating both sides of asphalt-saturated felt with paint and subsequently printing designs or patterns on the front or wearing surface. Practically no floor oilcloth has been made in the United States during the past few years; felt-base floor covering has supplanted floor oilcloth.

In the "Digests of Trade Data with Respect to Products On which Concessions Were Granted By the United States" to the United Kingdom in the "Trade Agreement Between the United States And the United Kingdom," in which the provision for felt-base floor covering is inserted, the product is described as follows:

Description and uses
-----

Felt-base is a type of "hard-surface" floor covering. In gage, or thickness, it corresponds aproximately to the lighter or thinner gage of linoleum; in appearance it resembles printed linoleum. Although felt-base floor covering and printed linoleum are both made in designs resembling inlaid linoleum the fact that the designs in inlaid linoleum are formed from linoleum cement of different colors while the designs in felt-base and printed linoleum are printed in oil paints renders these products somewhat dissimilar in appearance and results in different standards of quality. The designs in inlaid linoleum extend through to the burlap backing whereas the designs in felt-base and printed linoleum are merely printed on the upper, or wearing, surface and are comparatively superficial.

Felt-base is used principally as a floor covering in the home, particularly in the homes of the middle and lower economic groups. About one-half the quantity entering into consumption is used in the form of rugs, which range in size from 18 by 36 inches to 12 by 15 feet. Felt-base rugs and piece goods are not, as a rule, cemented to the floors upon which they are laid, as is linoleum.

The definition of "felt-base floor covering" in the "Summaries of Tariff Information," 1948, volume 10, page 98, is as quoted in the record, *supra.*

Neither side has quoted nor appears to rely upon any particular dictionary definitions which might throw light upon the meaning of the word "felt-base" in the context of paragraph 1021, as modified, *supra.* But certainly there is ample evidence in the recital of the material which was available to the negotiators of the trade agreement with the United Kingdom and of the General Agreement on Tariffs and Trade that the commodity which was intended to be provided for under the designation "felt-base" was a hard-surface floor covering, similar to linoleum, having a painted design and a painted back, a relatively thin product which is made from a felt which has been saturated with asphalt or other resinous substance. There is little doubt that the article provided for under the designation "felt-base" was a product composed of, rather than attached to, felt—a distinct and specific item

of merchandise having well-defined and well-understood characteristics and properties.

We do not construe the provision in issue as a designation by description intended to embrace all floor coverings having felt backs. We consider this to be an *eo nomine* provision for a particular kind of floor covering composed of felt and resembling linoleum. Under the circumstances, we find little merit in the position taken by the plaintiff in this case that the merchandise at bar consists of felt-base floor covering.

Moreover, we are of opinion that the instant record is inadequate to establish that the subject material is, in fact, or in contemplation of law, floor covering of any kind. The provision for floor covering is one which, it is clear, names an article in terms of its use. Before a fabric may be held to fall within a provision for floor coverings, it must be established that its use is for covering floors. Where use is in issue, the primary consideration is chief use. *Bob Stone Cordage Co. et al.* v. *United States*, 51 CCPA 60, C.A.D. 838.

While it is true that an importer has every reason to know the uses to which his product may be put, and the uses of which he is cognizant may ordinarily be expected to be those to which the merchandise is applied (*United States* v. *The Baltimore & Ohio R.R. Co. a/c United China & Glass Company*, 47 CCPA 1, C.A.D. 719), it is still incumbent upon a party claiming a specified use to establish it by adequate proof. Evidence that a very insignificant portion of the importer's business is concerned with the distribution of floor coverings, coupled with proof of use on some 30 occasions in 12 or so states, scarcely suffices to establish chief use. As this court observed in *L. Tobert Co., Inc., et al.* v. *United States*, 28 Cust. Ct. 456, Abstract 56581, affirmed 41 CCPA 161, C.A.D. 544—

* * * The fact of chief use is difficult to prove. It ordinarily entails rather exacting evidence of use throughout the United States and cannot depend upon evidence of use locally. It appears from the record that the testimony of plaintiffs' witnesses to which reference has been made, *supra*, covered a relatively narrow field—in and about New York, with an isolated instance in Oklahoma—which certainly falls short of the requirements of proof of chief use. [Cases cited.]

We are not convinced that the sample of the material in issue is so clearly indicative of its eventual use as to obviate the need for proof that, in its condition as imported, it is a product chiefly used for covering floors.

Based upon the foregoing considerations, we find the instant record inadequate to establish that the subject merchandise is felt-base floor covering within the provisions of paragraph 1021, as modified, *supra*. All claims in the protest are, therefore, overruled.

Judgment will be entered accordingly.