361 F.2d 128
 66-1 USTC P 9413
 Ellsworth M. STATLER TRUST of January 1, 1920, for Ellsworth
Morgan Statler, Frank C. Moore, Edwin F. Jaeckle
and The Marine Trust Company of Western
New York, Trustees, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Ellsworth M. STATLER TRUST of January 1, 1920, for Marian F.
Statler, Ellsworth M. Statler Portion, Frank C. Moore, Edwin
F. Jaeckle, and The Marine Trust Company of Western New
York, Trustees, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Ellsworth M. STATLER TRUST of January 1, 1920, for Marian F.
Statler, Milton Howland Statler Portion, Frank C. Moore,
Edwin F. Jaeckle, and The Marine Trust Company of Western
New York, Trustees, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 148-150, Dockets 29926-29928.
 United States Court of Appeals Second Circuit.
 Argued Jan. 25, 1966.
Decided May 13, 1966.
 
 Daniel G. Yorkey, Buffalo, N.Y. (Phillips, Lytle, Yorkey, Letchworth, Hitchcock & Blaine, Buffalo, N.Y.; Donald F. Runyan, Edward M. Griffith, Jr., Buffalo, N.Y., of counsel), for petitioner.
 Loring W. Post, Washington, D.C. (Richard M. Roberts, Acting Asst. Atty. Gen., Meyer Rothwacks, Attorney, Department of Justice, washington, D.C.), for respondent.
 Gustave J. Soderberg, Jr., Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel, amicus curiae for Ultimate, Indefinite and Uncertain Charitable Beneficiaries.
 Before FRIENDLY and HAYS, Circuit Judges, and DOOLING, District judge.*
 FRIENDLY, Circuit Judge:
 
 
 1
 This petition to review a decision of the Tax Court, 43 T.C. 208 (1964), on capital gains and deductions as applied to the income taxation of trusts, raises a novel question of the construction to be given the Internal Revenue Code of 1954.
 
 
 2
 In 1920 Ellsworth M. Statler executed an indenture conveying large amounts of stock of Hotels Statler Company, Inc., in trust for the benefit of his descendants. The indenture provided that separate trusts be established for each of Mr. Statler's children, though in all significant aspects the trust estate was to be administered as a single fund. The trustees were directed to make charitable gifts of not less than 15% Nor more than 30% Of the net income in each year; the charities were to be chosen by majority vote of the trustees and Mr. Statler's children, but only the trustees were to determine the precise percentage, within the stated limits, to be expended from the income of each trust. By 1954, the year to which this controversy relates, the trustees were obligated to pay all the income remaining after the charitable set-aside to persons who were of full age; upon their death the corpus passes to other individuals, with no charity having an interest therein.
 
 
 3
 In 1954, the trusts owned 217,088 shares of Statler stock, which they had held for many years. Under a series of agreements they and other large Statler shareholders sold their stock to Hilton Hotels Corporation pursuant to a plan whereby the assets of Statler would be sold and the company liquidated. The trustees received some $50 per share, of which approximately $47 was long-term capital gain. Initially they allocated the entire proceeds to principal, but income beneficiaries contested the propriety of this under New York trust law. A compromise agreement between the trustees, the income beneficiaries, the Attorney General of New York representing the undesignated charitable beneficiaries, and a special guardian representing an infant and unknown contingent beneficiaries, was executed in November 1955 and approved by the Supreme Court, Erie County, in December. This provided that $15.50 per share should be allocated to income, that 15% Of this sum less commissions of 2% Should be paid to charities in accordance with the indenture, that the balance of the $15.50 should be distributed to the other beneficiaries, and that the rest of the proceeds should be added to corpus. On December 30, 1955, the trustees made payments of some $367,000 to charities qualifying for exemption under the Internal Revenue Code.[1]
 
 
 4
 The trustees filed their 1954 federal income tax returns prior to the execution of the compromise but evidently in anticipation of its terms. Deductions other than the charitable contributions under the compromise agreement sufficed to offset income other than longterm capital gains. The returns reported the capital gain, subtracted the payments to the charities, and computed the tax on the balance under the alternative tax provided in 1201(b) of the 1954 Code.[2] The issue, decided against the trusts by the Tax Court, is whether the payments to the charities were properly subtracted.
 
 
 5
 It will be useful to begin by dissipating any obscurities caused by the delayed execution of the compromise agreement and the resulting form of the tax returns. The Commissioner does not dispute that the issue is to be determined as if the correct allocation had been determined and payments made in 1954. See Rev.Ruling 62-147 and cases under earlier Revenue Acts there cited, 1962-2 Cum. Bull. 151. It is agreed also that if the settlement had been concluded before the tax returns were filed, the entire amount of the gain distributed to the non-charitable income beneficiaries, approximately $13 per share, would have been deductible by the trustees under 661(a), and each non-charitable beneficiary, in computing his tax on such gain, would have been entitled under 662(b) to avail himself of the alternative tax. Hence nothing turns on the fact that the trustees here paid the capital gains tax attributed to the amounts distributable to these beneficiaries and deducted this from the amount the beneficiaries would otherwise receive. The case concerns only two items, the capital gain added to corpus, some $31.56 per share, and the portion distributed to charity, some $2.28; the issue is whether the alternative tax is to be computed on the former figure alone, as the trustees insist, or on the sum of the two, $33.84, as the Commissioner and the Tax Court have ruled.
 
 
 6
 It will be easier to understand the issue if we take a hypothetical case and assume that, after payments to non-charitable income beneficiaries of their share of the gain, the remaining gain is $500,000, the required income payment to charities is $40,000 and the trust has no other income or expense, so that, apart from taxes, $460,000 would be added to corpus. The parties agree that, the trust having already deducted the payments to the non-charitable income beneficiaries, we next turn to 1202, which allows it to deduct 50% Of the gain other than amounts includible by the income beneficiaries, to wit, $250,000. They agree also that 642(c) allows a deduction for half of the $40,000 paid to charities, or $20,000-- the remaining half having been already deducted under 1202-- thereby leaving taxable income of $230,000, all representing long-term capital gain. We thus arrive at the computation of the alternative tax under 1201(b), see fn. 2. The Commissioner computes this as follows:
 
 
 7
 (1) Partial tax on taxable income, $230,000, reduced by 50% Of long-term capital gains of $500,000, or $250,000, to wit, minus $20,000 = 0.
 
 
 8
 (2) 25% Of long-term capital gains of $500,000 = 125,000. $125.000.
 
 
 9
 The trustees say that 1201(b)(2) must be read as excluding long-term gain they were required to pay the charities as current income, and that the correct tax is 25% Of the $460,000 added to corpus, or $115,000.
 
 
 10
 The Commissioner insists that in referring simply to 'net long-term capital gain,' 1201(b)(2) does not contemplate any deduction for charitable contributions and is on its face clear and unambiguous. He argues there is no unfairness in literal application of the statute because the alternative tax is still less than the regular rate, and relies on Weil v. C.I.R., 229 F.2d 593 (6 Cir. 1956), which held that an individual taxpayer may not use an excess of deductions over ordinary income to reduce long-term capital gains before applying the 25% Rate. The trustees answer that the Code sections on capital gains cannot be read without taking account of the trust provisions in Subchapter J, which by 641(b) were declared to prevail over inconsistent sections on treatment of individual taxpayers; that these provisions treat the trust as a mere conduit; and that the so-called 'separate basket' theory of Weil is inapplicable to income which the trust never owned. Certainly this case raises a different question from Weil. That case held only that, in terms of the present statute, 'the excess of the net long-term capital gain over the net short-term capital loss' cannot fairly be read as equivalent to 'the excess of the net long-term capital gain over the sum of (a) the net shortterm capital loss and (b) the excess of deductions (other than that provided in 1202) over other income'; the court had no occasion to consider whether net long-term gain belonging to a charitable income beneficiary may be excluded by a trust in computing the alternative tax. The Commissioner replies to all this with 663(a)(2), which forbids the inclusion, as a distribution deduction to the trust under 661(a) or as an item in the income of a beneficiary under 662(a), of any charitable distribution qualifying for the deduction provided in 642(c).
 
 
 11
 Federal income taxation of trusts and their beneficiaries has long been based on the principle that the trust 'is in general treated as a conduit through which income passes to the beneficiary.' H.R.Rep. No. 1337, 83d Cong., 2d Sess., 1954 U.S.Code Cong. & Ad.News 4017, 4087. The general scheme of the 1954 Code, like that of its predecessors, is to treat currently distributable income 'not as the trust's income, but as the beneficiary's,' whose 'share of the income is considered his property from the moment of its receipt by the estate.' Freuler v. Helvering, 291 U.S. 35, 41-42, 54 S.Ct. 308, 310-311, 78 L.Ed. 634 (1934).[3] Consistently with this the Commissioner does not suggest that 1201(b) should be construed as requiring inclusion of long-term gain distributable to noncharitable beneficiaries, although a strictly literal reading would lead to that conclusion and neither 661(a) nor 662 nor any other section expressly dictates the contrary. He says, however, as already indicated, that even when a distribution of gain to a charity must be made by a trustee as from current income, so that from a trust accounting point of view the charity stands no differently than any other income beneficiary, the tax result is otherwise because the Code lumps all payments to charities as a deduction under 642(c) and 663(a)(2) forbids the treatment of such payments as amounts to be deducted from the trust income under 661(a) or to be included in the income of a beneficiary under 662(a).
 
 
 12
 The argument stresses the form at the neglect of substance; the letter of 1201(b) must yield when it would lead to an unfair and unintended result. See Read v. United States, 320 F.2d 550 (5 Cir. 1963). Congress considered charitable contributions from capital gains to be generally within the conduit principle, as demonstrated by their inclusion in the definition of distributable net income in 643(a)(3).[4] Amounts paid or permanently set aside for charity were dealt with separately in 642(c) apparently because Congress did not wish charitable gifts by trusts to be subject to the percentage limitations imposed on individuals in 170(b). Having authorized this broad deduction in 642(c), Congress enacted 663(a)(2) to prevent the trust from having a double deduction and a beneficiary from claiming a charitable deduction already taken by the trustee. See H.R.Rep. No. 1337, supra, 1954 U.S.Code Cong. & Ad.News 4344; Sen.Rep., id. at 4621. None of this speaks to the point whether Congress meant that gains required to be paid to a charity as distributable income should be included in computing the alternative tax under 1201.
 
 
 13
 The increase in the tax due to including such distributable gains in computing the alternative tax would have to be borne by either the charities or the remaindermen. If, as the compromise agreement here authorized, the trustee takes from the charities a quarter of the amount otherwise distributable to them on the theory that the charitable gifts required to be made out of income should not increase the tax burden on the remaindermen, there is an indirect incursion on the exemption afforded the charities by 501. On the other hand, to place the burden on the remaindermen would subject them to a higher tax than if the settlor has not included charities among the income beneficiaries.[5] Such a situation is quite different from that in Weil where the taxpayers in effect made charitable gifts of gains they themselves realized during the year. Thus the literal reading of 1201(b) urged by the Commissioner would not only be inconsistent with the general scheme of trust taxation but would bring about adverse results with respect to charitable gifts that Congress is unlikely to have intended. The Supreme Court's observation in Helvering v. Bliss, 293 U.S. 144, 150-151, 55 S.Ct. 17, 20-21, 79 L.Ed. 246 (1934), although on a different problem, seems singularly apt:
 
 
 14
 'The exemption of income devoted to charity and the reduction of the rate of tax on capital gains were liberalizations of the law in the taxpayer's favor, were begotten from motives of public policy, and are not to be narrowly construed.'
 
 
 15
 See also United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 543-544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); J. C. Penney Co. v. C.I.R., 312 F.2d 65, 68 (2 Cir. 1962).
 
 
 16
 We decide only that long-term capital gain required to be treated by a trust as distributable income to charities need not be included in 'the excess of the net long-term capital gain over the short-term capital loss' under 1201(b)(2); we are not required to determine what the result here would have been if the trustees had exercised their power to make a charitable distribution greater than the 15% Required by the trust agreement.
 
 
 17
 Reversed.
 
 DOOLING, District Judge (dissenting):
 
 18
 Section 663(a)(2) precludes treating the current distribution of a capital gain amount to charity as a deductible distribution under Section 661(a) to which the conduit treatment of Section 662(b) is accorded; an amount so paid out is a deduction in the trustee's return under Section 642(c). The consequence, it would appear, is that the alternative tax on the trustee income, computed with allowance of the charitable deduction of 642(c), is measured on the sum of the capital gain that the trustee retains for corpus and the capital gain that he pays out currently to charity. The retained corpus capital gain is, plainly, not so generously relieved of tax as it would have been if the statute had permitted the trustee to treat the charitable payment as distributable income under Section 661(a). But the Congress has, nevertheless, treated all similarly situated taxpayers alike in this respect, denying them any greater measure of relief from their tax liability by reason of the charitable nature of certain of their deductions than the relief which the present trust received at the hands of the Commissioner and the Tax Court and the relief that Weil received in the Sixth Circuit. Weil v. Commissioner, 6th Cir. 1956, 229 F.2d 593. The nature of the other deductions for which Weil received no capital gains tax relief did not affect the decision; it would have been the same had they all been charitable deductions.
 
 
 19
 To be sure in such a case as the present one the current distributable charitable amount must be viewed as vesting directly in charity at the instant the gain accrued to the trust and must not be thought of as accruing first to the trustee and then being devoted to charity by a separate and subsequent act of will on the trustee's part. But the Congress by the tight and explicit structure of the Subchapter J provisions has denied to charitable payments out of trusts what would otherwise be the consequence of that analysis. The analysis reflects the fact that currently distributable charitable amounts would by their intrinsic nature be distributions and deductible as such in the trustee return under Section 661(a) but for the existence of Sections 663(a)(2) and 642(c) which convert them into deductions and deny them the character of distributions. The statute's effect is too plain to be supposed an inadvertent one, and it is far from being ungenerous. The alternatives are payment of tax at ordinary rates on half the capital gain less the adjusted deduction for the part of it paid to charity or paying a tax on that same income amount equal to a quarter of the total capital gain. When the Congress has, manifestly, subtilized its treatment of a many threaded pattern, its clear words would seem a safer guide to meaning than invoking a purpose or spirit inferred from the more general structural features of a very complex enactment.
 
 
 20
 It would not seem that any analogy could be expected in the treatment of capital gains currently distributable to the taxable beneficiaries. To them apply Sections 651(a) and 661(a) governing trustee deductions for current distributions, as well as the key 'conduit' sections 652(b) and 662(b). Nor does the inclusion in 'distributable net income' of capital gains paid, set aside to, or used for charity, see Section 643(a)(3), appear to accord 'conduit' treatment to those amounts. Section 663(a)(2) excludes them from the trustee's distribution deductions under Sections 651(a) and 661(a); the references to the deduction under Section 642(c) in Sections 662(a)(1) and 662(b), third sentence, make clear that inclusion of the charitable payment amounts in 'distributable net income' under Section 643(a)(3) does not mean that in consequence they are to be treated as distributions or as being within the conduit principle; it rather implements an unrelated restraint by seeing to it that the inclusion of the gains in 'distributable net income' functions only to restrain the operation of the ratable allocation principle of the conduit subsection, Section 662(b), so that tax exempt income items, and the like, are not over-allocated to the amounts that are distributions under Section 661(a) and are within the conduit principle of 662(b). The conduit notion does not reach the charitable capital gains except for an intermediate step in applying conduit theory to Section 661(a) distributions that exclude capital gain currently distributable to charity.
 
 
 21
 As indicated, there would not appear here to be any tax imposed upon the charitable share of the capital gain, but only a diminished Section 1201(b) relief from the tax on the trustee retained capital gain. The provision in the compromise agreement for a retention from the charitable distribution for any tax deficiency allocable to it might, on that theory, have presented a question of the interpretation of the compromise agreement, and, if the alternative tax was not lower, a related question about the size of the charitable deduction for the purpose of making the tax computation at ordinary rates.
 
 
 
 *
 Of the Eastern District of New York, sitting by designation
 
 
 [1]
 This figure represents only payments from the three trusts involved in this appeal. In addition, the trustees paid out and set aside some $75,000 from a fourth trust administered as a part of the overall estate
 
 
 [2]
 Section 1201 provides:
 "(b) Other Taxpayers.-- If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 1 and 511, there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of--
 (1) a partial tax computed on the taxable income reduced by an amount equal to 50 percent of such excess, at the rate and in the manner as if this subsection had not been enacted, and
 (2) an amount equal to 25 percent of the excess of the net long-term capital gain over the net short-term capital loss.'
 Since 1202 authorizes deduction of 50% Of the excess of net long-term capital gain over net short-term capital loss, the entire excess is eliminated in computing the partial tax under 1201(b)(1) and the excess is taxed at the 25% Rate provided in 1201(b)(2).
 
 
 [3]
 'The novelty of the 1954 Code was in creating a new concept to distinguish between taxable and tax-free distribution-- distributable net income-- which is based on the trust's taxable income (with appropriate adjustments), rather than on income as defined by state law * * *.' Bittker, Federal Income and Estate Taxation 362 (3d ed. 1964)
 
 
 [4]
 The Senate Report on this provision declared:
 'In order to implement the conduit theory in a satisfactory manner, it is necessary to include in the measure items of income and deductions which are not reflected in taxable income. The bill adopts the concept of 'distributable net income' as the measure * * *' Sen.Fin.Comm.Rep., 83rd Cong., 2d Sess., 1954 U.S.Code Cong. & Ad.News 4621, 4715.
 The Conference Committee Report sustaining the Senate amendment to the section stated:
 'This amendment changes the definition of distributable net income to insure that where capital gains must be or are added to principal, they will be taxed to the estate or trust. But where capital gains are paid, credited, or required to be distributed to any beneficiary, or paid, permanently set aside, or to be used for the purposes specified in section 642(c), such gains are to be included in the computation of distributable net income.' H.R.Rep.No. 2543, id. at 5314; see also, Sen.Fin.Comm.Rep., supra at 4984.
 
 
 [5]
 Although the amount in this instance is small in proportion to the gain, the same principle would have to apply if our hypothetical case were altered so that the payment to charity was $150,000 rather than $40,000. On that assumption the tax on a $350,000 increment to corpus would be $125,000 under the Commissioner's theory, as against $87,500 on the taxpayers'