(C.D. 4389)

Ross Machine & Mill Supply, Inc., et al. *v.* United States

United States Customs Court, Second Division

(Decided November 15, 1972)

*Stein & Shostak* (*Marjorie M. Shostak* of counsel) for the plaintiffs.
*Harlington Wood, Jr.,* Assistant Attorney General (*Glenn E. Harris* and *Velta A. Melnbrencis,* trial attorneys), for the defendant.

Before Rao, Ford and Newman, Judges

Ford, Judge: The cases listed in schedule "A," annexed hereto and made a part hereof, consolidated for the purpose of trial, involve the proper classification of various importations of chilled cast-iron roll bodies. In four of the entries,[1] the merchandise was classified under item 666.25, Tariff Schedules of the United States, and assessed with duty at the rate of 11.5 per centum ad valorem. The same type of

---

[1] Entries CE 1592, 628, 684, 296.

merchandise in the remaining three entries [2] was classified under item 680.90, Tariff Schedules of the United States, and assessed with duty at the rate of 19 per centum ad valorem.

It is the contention of plaintiffs that all of the merchandise is properly subject to duty at the rate of 3 per centum ad valorem under item 680.60, Tariff Schedules of the United States. This provision was added to the Tariff Schedules of the United States by virtue of section 48(b) of the Tariff Schedules Technical Amendments Act of 1965, Public Law 89-241, 100 Treas. Dec. 661, T.D. 56511. This provision was originally enacted as item 680.58 but was redesignated item 680.60 by the Automotive Products Act of 1965, Public Law 89-283, 100 Treas. Dec. 845, T.D. 56540.

Pursuant to the provisions of section 2(b) of the Tariff Schedules Technical Amendments Act, *supra*, requests were timely filed with customs at Duluth, Minnesota, seeking liquidation of the unliquidated entries and reliquidation of the liquidated entries under item 680.58, *supra* (redesignated 680.60, *supra*).

The pertinent Tariff Schedules of the United States provisions involved provide as follows:

|  | Industrial machinery for preparing and manufacturing food or drink, and parts thereof: |  |
|---|---|---|
| 666.20 | Machinery for use in the manufacture of sugar, and parts thereof_____ | * * * |
| 666.25 | Other _____ | 11.5% ad val. |
| * | *    *    *    * | *    * |
| 680.90 | Machinery parts not containing electrical features and not specially provided for_____ | 19% ad val. |
| 680.60 | Cast-iron (except malleable cast-iron) rollers for machines, not alloyed and not advanced beyond cleaning, and machined only for the removal of fins, gates, sprues, and risers or to permit location in finishing machinery _____ | 3% ad val. |

Section 2 of the Tariff Schedules Technical Amendments Act, *supra*, provides as follows:

SEC. 2. EFFECTIVE DATE

(a) Except as otherwise provided, the amendments and repeals made by this Act shall apply with respect to articles entered, or withdrawn from warehouse, for consumption after the 60th day after the date of the enactment of this Act.

---

[2] Entries CIE 128, 350, 877.

(b) Upon request therefor filed with the collector of customs concerned on or before the 120th day after the date of the enactment of this Act, the entry or withdrawal of any article—

(1) which was made after August 30, 1963, and before the 61st day after the date of the enactment of this Act, and

(2) with respect to which the amount of duty would be smaller if the amendments and repeals made by this Act (other than the amendments made by sections 28(a), 53(a), 78(a) and (b), and 87(a)) applied to such entry or withdrawal,

shall, notwithstanding the provisions of section 514 of the Tariff Act of 1930 or any other provision of law, be liquidated or reliquidated as though such entry or withdrawal had been made on the 61st day after the date of the enactment of this Act.

The record herein consists of the testimony of four witnesses called on behalf of plaintiffs and two called on behalf of defendant. The official papers were received in evidence without being marked and plaintiffs introduced 39 exhibits, 34 of which were received in evidence. Defendant introduced eight exhibits in evidence but withdrew exhibit A. In addition, counsel for the respective parties stipulated that the cast-iron roll bodies the subject of this case are made of nonmalleable cast iron and in their condition as imported, the roll bodies are ready for the insertion of journals.

Mr. Allan Burke, managing director of the manufacturer and a professional chartered engineer, testified as to the manufacture of the chilled iron roll bodies manufactured by his company. The witness was familiar with the method of manufacture having at one time been manager of the chilled iron roll shop. He testified that the roll bodies involved are cast iron made of nonalloyed material under both the British standard specifications and the definition in Schedule 6, Part 2, Subpart B, Headnote 2(h) of the Tariff Schedules of the United States. Under his supervision, tests were made of the materials used in the production of roll bodies to insure that the components were as stated on the invoice.

The roll bodies manufactured by his company were made by a process known in the trade as the "Static Chill Method" which is considerably different from the centrifugal method. The former method is used because, based upon his experience, it gives more endurance in use. The major differences between the two methods are that the molds in the static method are vertical while in the centrifugal method they are horizontal, and in the former the metal is melted and poured from a cupola into a ladle and then fed into a mold while in the latter, an electric furnace is used. The amount of loss in the metal poured between the two methods is considerable. In the centrifugal method, 90 percent of the metal poured is utilized while only 40 percent is utilized in the static method.

After describing the casting process, Mr. Burke then testified as to what was done to the casting. Due to the heavy weight of the roll, the process of manufacture is to have a head and tail on the roll of approximately 12 inches cut off to get the proper access to clean the belly core from the center of the roll. The carbon inclusions which are picked up on the face of the roll are removed. The roll is put on a lathe to remove the sand inclusions. This is done to insure the roll is free from porosity. The roll is then placed on a "V" block on a small boring machine to clean out both ends to make locations for placement in the rough turning lathes. After the heads and tails are removed, the belly core, which is composed of sand core, is exposed and then it is removed by a metal bar. The rolls are then placed under water pressure and the loose sand is cleared from the core.

The next process was described by Burke as follows:

A. We now have to get rid of the broken area shown on Exhibit 7 in order to leave a clear face for any use which Ross will make of the roll and also to ascertain for ourselves whether we have porous free iron in the bore of the roll. This is vital because the gudgeons which are fitted into either end of the roll and drive it in the machine in severe pressures of 25 and 30,000 pounds have no other means of staying in the roll other than the final fit of the steel to the iron bore. If there is bad porosity or any porosity in that roll, the roll is scrap. We do not ship rolls in this condition.

Q. You use the word "gudgeons." Do we have a word that we use more frequently in the United States?—A. I believe the word "journal" is more widely used in the United States.

Q. For the purposes you have indicated, what is then done to the end of the roll, to each end of the roll, one of which is exposed in Plaintiff's Exhibit 7?—A. This is put on an ordinary horizontal boring machine and the first operation is to run straight down the ends of the roll and to get rid of this piece of broken area to leave a clean face on the end of the roll. We then bore and ream the gudgeon bores so that we can inspect it to find out if there is any porosity.

Following this the head and tail risers are removed by a boring machine which also bores out the main journal diameters. When this is accomplished, the rolls are given a proof grinding to remove the ridges from the face of the roll to determine whether the roll has a porous-free surface in order to permit final machining by the importer.

Before exportation, the surface of the rolls and the bores are greased to prevent oxidation during shipment. This is sometimes referred to as painting to prevent oxidation. All of the operations performed by the manufacturer are to clean the casting and insure it is free from porosity.

The processing by Ross is as follows:

A. The machine gudgeons are fitted in Oklahoma City by an hydraulic press method of pushing the gudgeons to the roll body. It is then put under a grinding machine off the centers of the gudgeons and is ground down to the finished size of the roll for presentation; after which, it is put under a corrugating machine and the surface of the roll is corrugated provided, at that point, it is clearly seen there is no porosity and inclusions in the face of the roll because experience has shown when the corrugating process is carried out, the surface of the corrugation will crackle and break away if there are any porosity inclusions on the face of the roll.

The rolls as received are not ready for incorporation into final grinding machinery. The journals must first be inserted.

Mr. Robert Fry, president of A. T. Ferrell & Co., the parent company of the importer, testified that the imported roll bodies in their condition as imported are ready to have the journals installed. Ross installs the journals and does the finishing work, the grinding and corrugating. He further testified as to the customs treatment given to the importations of the identical rolls in Houston and San Francisco and indicated that after the Technical Amendments Act of 1965, *supra*, duty was finally settled at 3 percent except at Duluth.

The balance of the witnesses called by plaintiffs, Billie Farnum and Arthur Goff testified as to their part in seeking the passage of the Technical Amendments Act of 1965 and the 1968 amendment covering castings.

Defendant's witnesses, both employees of U.S. Pipe, testified as to the centrifugal method of chill casting employed by their company. After casting the cleaning operation involved metallic sheet-blasting of the outside and inside surfaces. A visual inspection is made to determine if there are any flaws in the casting. The ends are then cut off. Some work is done to the ends of the casting to permit their insertion in a lathe and some metal is removed. The rough turning is not part of the finishing operation. The return of defective rolls is for porosity on the outside dimension or lowness in hardness.

Upon the record as made, it is evident that the importations involve certain chilled cast-iron roll bodies composed of nonmalleable cast iron which have been cleaned and machined and all fins, gates, sprues and risers have been removed. In addition, certain machining has been done to the roll bodies to permit the location of journals in said articles. The operations for the removal of the above or to permit the location of journals have the additional purpose of permitting the determination of the porosity of the merchandise.

It is well established that the master rule in the construction of statutes is to interpret them so as to carry out the legislative intent.

*L. R. Markell et al.* v. *United States*, 16 Ct. Cust. Appls. 518, T.D. 43239 (1929); *Cassard Romano Co., David A. Haagens* v. *United States*, 19 CCPA 191, T.D. 45294 (1931); *Proctor & Gamble Manufacturing Co.* v. *United States*, 19 CCPA 415, T.D. 45578 (1932); *United States* v. *Clay Adams Co., Inc.*, 20 CCPA 285, T.D. 46078 (1932). While it is the function of the courts to construe the language of the statute so as to give effect to the intent of Congress, there is no invariable rule for the discovery of that intention. *United States et al.* v. *American Trucking Associations, Inc. et al.*, 310 U.S. 534, 542, 84 L.Ed. 1345 (1940).

Inasmuch as the claimed provision was added to the tariff schedules by virtue of the Technical Amendments Act of 1965, *supra*, the legislative history and the genesis of the provision may be considered in order to ascertain the errors which Congress, in enacting the provisions, corrected. These errors cannot be ascertained from the statutory provisions but may be from the legislative history. Senate Report 530, 89th Congress, 1st Session, on the Technical Amendments Act of 1965 makes this quite clear, wherein the following is set forth:

> H.R. 7969, the Tariff Schedules Technical Amendments Act of 1965, would amend the tariff schedules of the United States to correct certain errors brought about by the adoption of these schedules.
>
> In addition, the bill as reported by the Committee on Finance contains a number of provisions which were not included in the House bill. Basically, these provisions can be described in three categories.
>
> First, a series of amendments were adopted to further perfect the tariff schedules with respect to items largely called to the attention of Congress after the House had acted on the bill. These amendments generally restore the duty treatment applied under the old tariff structure and are consistent with the actions taken by the House.

Section 48 of said act covered rough iron castings and the report, *supra*, makes the following statement:

> *3. Section 48. Rough iron castings*
>
> The old tariff structure imposed a duty of 3 percent on certain types of rough nonmalleable iron castings. Under the new schedules some of these castings became subject to higher rates.
>
> The House provision restored the 3-percent rate to rough castings used in filtration and purification machinery. Since the bill passed the House another instance has come to the committee's attention where rough nonmalleable cast iron rollers, formerly dutiable at 3 percent are now subject to a higher rate. The Committee on Finance has added a provision to restore the 3-percent rate to such rollers. The rollers giving rise to this amendment, upon finishing in this country, are used in machines which prepare grain for human food and animal feeds.

There is no dispute that the merchandise involved herein consists of rollers which are used in machines which prepare grain for human food or animal feeds as well as chemical processing. The testimony also establishes to our satisfaction that the rolls consist of nonalloyed metal. Accordingly, said rolls appear to fall within item 680.60, *supra*, if they have not been further advanced. The machining process for the determination of porosity appears to be the sole determining factor as to whether said rolls fall within the claimed provision.

While the importations involved herein were made prior to 1968, it is interesting to note that in the consideration of Public Law 90–638, 2 Cust. Bull. 616, T.D. 68–277, entitled "An act to amend the Tariff Schedules of the United States with respect to the rate of duty on certain nonmalleable iron castings, and for other purposes" which was made retroactive to importations made after August 30, 1963, Congress considered the use of language regarding porosity. The Bill, H.R. 653, 82 Stat. 1359, insofar as it related to cast iron, reads as follows:

> Cast iron (except malleable cast iron) parts, not alloyed and not advanced beyond cleaning or normalizing by heat treatment, and machined only for the removal of fins, gates, sprues, and risers, or for the determination of the porosity of the casting, or to permit location in finishing machinery, or painted only for protection from oxidation_____    * * *

The language as passed, however, eliminated reference to normalizing, determination of porosity and painting. This appears to be as a result of a ruling of the Bureau of Customs, plaintiff's exhibit 37, which reads as follows:

AUG 11 1967
TC 423.37 AS

(Addressee not disclosed)

We have your letter of August 1, 1967, regarding H.R. 653 and the language "normalizing by heat treatment;" "determination of the porosity of the casting;" and "painted only for protection from oxidation."

It is our opinion that normalizing of cast iron by heat treatment is not an advancement. For example, item 692.24, Tariff Schedules of the United States, provides for automobile parts of non-malleable cast iron, not alloyed and not advanced beyond cleaning, and machined only for the removal of fins, gates, sprues, and risers or to permit location in finishing machinery. If a casting which was an automobile part was normalized we would hold that such normalizing is permissible for classification under item 692.24, provided it was cast iron.

The same is true for machining which is done to determine porosity of the casting. However, the machining should not be extensive since we understand that only a light machining is required to determine porosity. Extensive machining would indicate to us that the casting has been advanced and the importer could be required to submit proof as to the reason for the machining.

We have decided that primer painting iron castings for preservation is not processing which removes an article from classification under item 692.24.

Sincerely yours,

(Signed) E. F. KILPATRICK
Director
Division of
Tariff Classification Rulings

This is confirmed by the statement contained in Senate Report 1496, 90th Congress, which reads as follows:

### SUMMARY

House Bill.—The Committee on Finance approved the substance of the House bill in restoring to certain unfinished nonmalleable cast iron parts used in bottling and packaging equipment, the tariff rate which was applicable to such parts immediately prior to August 31, 1963, the effective date of the Tariff Schedules of the United States. The committee made technical amendments in the House text to eliminate certain unnecessary language and to reflect tariff concessions negotiated during the Kennedy round.

\*         \*         \*         \*         \*         \*         \*

### NONMALLEABLE IRON CASTING

Background.—The purpose of this provision, as passed by the House, is to restore to certain unfinished nonmalleable cast-iron parts the tariff rate which was applicable to such parts prior to the effective date of the Tariff Schedules of the United States; that is, August 31, 1963.

Unfinished nonmalleable cast-iron parts of machinery for cleaning or drying bottles or other containers; of certain machinery for filling, closing, sealing, capsuling, or labeling bottles, cans, boxes, bags, or other containers; of certain other packing or wrapping machinery; of machinery for aerating beverages; of dishwashing machines; or of machine tools were dutiable under a general provision for cast-iron castings in paragraph 327 of the Tariff Act of 1930, as modified pursuant to trade agreement concessions, at the rate of 3 percent ad valorem.

The general provision for cast-iron castings was not continued in the Tariff Schedules of the United States because it was ambiguous in certain respects. In the Tariff Classification Study preceding the adoption of the tariff schedules, the Tariff Commission made a survey to determine the major imports which were being afforded the 3-percent tariff treatment and created special pro-

visions for such cast-iron products in appropriate portions of schedule 6 of the TSUS in order to continue the substance of the past tariff treatment. No special provision was created to cover the aforementioned unfinished parts (other than such parts of machine tools) which are now dutiable under TSUS item 662.20 at 10 percent ad valorem.

Like the Committee on Ways and Means of the House, the Committee on Finance is desirous of restoring the tariff treatment which applied to these castings prior to August 31, 1963. In 1965, Congress restored the tariff treatment which previously applied to rough-iron castings for purification systems and for rollers used in food processing plants. However, it did not deal specifically with rough-iron castings used in bottling or packaging machinery, because it appeared the volume of trade in such castings was insufficient to warrant a special tariff category.

The committee is now informed that significant imports of articles of a kind falling within the tariff classification description proposed for the new TSUS item 662.18 were made prior to August 31, 1963, the effective date of the Tariff Schedules of the United States, and were subject to a 3-percent duty. In view of this new information it is appropriate to aline the tariff treatment for these rough-iron castings in the same manner as was provided for other castings by the 1965 Tariff Schedules Technical Amendments Act.

House Bill.—The House bill would have specifically applied the lower tariff to rough-iron castings used in bottling and packaging machinery (and in machine tools) which had been normalized by heat treatment, machined for the purpose of determining its porosity, or painted for protection against oxidation. Enumerating these processes in the statute apparently was considered necessary to effectively restore prior tariff treatment to these castings. However specifying these processes under one provision would have raised questions as to whether rough-iron castings described in other tariff provisions could qualify for the lower tariff if they had been similarly processed. The Bureau of Customs was also concerned that the specified processes involved concepts which were new to customs administration and could lead to substantial litigation before their meanings were classified.

Committee Amendments.—After the bill passed the House, the Bureau of Customs indicated that the processes—"normalizing by heat treatment"; "determination of the porosity of the casting"; and "painted only for protection from oxidation"—as described in the House provision, were not such advancements in the manufacturing process as to require specific mention in the bill. Accordingly, since the specificity of the House bill is now unnecessary to achieve its objective, the Committee on Finance has omitted the unnecessary language from the bill.

Under the bill as amended, rough-iron castings for use in machinery for cleaning or drying bottles or other containers (including dishwashing machines), or for filling packages or labeling containers, or for aerating beverages, will again become dutiable as they were under the old tariff structure.

\*          \*          \*          \*          \*          \*          \*

Like the House bill, the committee amendment permits entries to be reliquidated with respect to importations entered after August 30, 1963. For purposes of measuring refunds as to importations before 1968, the duty on these castings is to be treated as if it had been 3 percent—the rate derived from former paragraph 327.

Based upon the foregoing, the processes of normalizing, machining for determination of porosity and painting were considered by the Bureau of Customs as being in the same category of advancing a casting as was the removal of fins, gates, sprues or risers.

It is therefore apparent that what the Bureau did not consider an advancement in its 1967 ruling was not an advancement at the time of importation. The machining for determining porosity was not, in our opinion, extensive and left a rough casting which had further machining, corrugating and the insertion of journals left to be performed in the United States by the importer.

The cutting operation which removed the head and tails of the casting was likened to the removal of fins, gates, sprues, and risers, and does not in our opinion constitute an advancement. The boring operation to permit the location of journals falls within the statutory language permitting machining "to permit location in the finishing machinery." The proof grinding operation which removes the ridges as shown in exhibit 9 is for the purpose of inspection to determine if the roll has a porous-free surface. The rolls are still rough castings at this stage.

We believe that the legislative history concerning rough iron castings establishes the error intended to be corrected by the Technical Amendments Act of 1965. To correct this error, item 680.60 was added to the Tariff Schedules of the United States by Public Law 89-241 in order to eliminate the inadvertent, unintentional rate change with respect to cast-iron rollers for machines which had previously been dutiable at the rate of 3 percent under paragraph 327, Tariff Act of 1930, as modified. The imported rolls, in our opinion, fall within the claimed provision.

Inasmuch as we have found the instant importations to fall within item 680.60, *supra*, classification under item 666.25, *supra*, as parts of industrial machinery for the preparation and manufacture of food or drink or under item 680.90 as machinery parts not containing electrical features and not specially provided for is untenable. Item 680.60 more specifically provides for the importations at bar. In addition, by virtue of General Interpretative Rule 10(ij), the claimed provision prevails over the classified provisions for parts. The protests are accordingly sustained.

Judgment will be entered accordingly.